Todd Pickles (SBN 215629)
Henry Stroud (SBN 342479)
GREENBERG TRAURIG, LLP
400 Capitol Mall, Suite 2400
Sacramento, CA 95814
Telephone: (916) 442-1111
Facsimile: (916) 448-1709
picklest@gtlaw.com
henry.stroud@gtlaw.com

Attorneys for Plaintiffs/Counter-Defendants
E.Y. OROT ASSETS LTD. and
OMEGA ECO DIAMONDS LTD.

Jeffrey E. Tsai (SBN 226081)
James S. Davidson (SBN 347622)
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA 94105
Telephone: (415) 836-2500
Facsimile:  (415) 836-2501

Attorneys for Defendant/Counterclaimant
DIAMOND FOUNDRY INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| E.Y. OROT ASSETS LTD., an Israeli company, and OMEGA ECO DIAMONDS LTD., an Israeli company,<br><br>Plaintiffs,<br><br>v.<br><br>DIAMOND FOUNDRY INC., a Delaware corporation,<br><br>Defendant. | CASE NO.: 3:24-cv-03836-TLT<br>**STIPULATION AND [PROPOSED] ORDER TO AMEND COMPLAINT**<br><br>Action Filed:  June 26, 2024 |

Plaintiffs/Counter-Defendants E.Y. Orot Assets Ltd. and Omega Eco Diamonds Ltd. ("Plaintiffs") and Defendant/Counterclaimant Diamond Foundry Inc. ("Defendant") by and through their respective counsel, hereby stipulate and agree as follows:

WHEREAS, on June 26, 2024, Plaintiffs filed the Complaint [ECF No. 1];

WHEREAS, Plaintiffs seek to amend the Complaint to remedy a scrivener's error that has no substantive effect on the proceedings thus far;

WHEREAS, on January 15, 2025, Defendant consented to Plaintiffs' amendment of the Complaint;

WHEREAS, the parties agree that the proposed amendment to the Complaint does not effect and would not change Defendant's Answer to the Complaint and Amended Counterclaim [ECF No. 55];

WHEREAS, Federal Rule of Civil Procedure 15(a)(2) permits any party to file an amended pleading "with the opposing party's written consent."

BASED ON THE FOREGOING, THE PARTIES STIPULATE AND AGREE AS FOLLOWS:

1.      Pursuant to Federal Rule of Civil Procedure 15(a)(2), Defendant consents to Plaintiffs' amendment of its Complaint in the form attached hereto as **Exhibit A**;

2.      Plaintiffs may file the First Amended Complaint within seven (7) days of the Court's entrance of an Order granting this Stipulation; and

3.      Defendant's Answer to the Complaint and Amended Counterclaim [ECF No. 55] shall serve as Defendant's response to the First Amended Complaint.

**IT IS SO STIPULATED.**

///

///

///

///

///

///

1   DATED: January 15, 2025                    GREENBERG TRAURIG, LLP

2

3                                              By:___*/s/ Todd Pickles*_____

4                                                 Todd Pickles
                                                  Henry Stroud
5

6                                                 Attorneys for Plaintiffs/Counter-Defendants
                                                  E.Y. OROT ASSETS LTD. and
7                                                 OMEGA ECO DIAMONDS LTD.

8

9   DATED: January 15, 2025                    DLA PIPER LLP (US)

10

11                                             By:___*/s/ Jeffrey E. Tsai*_____

12                                                Jeffrey E. Tsai
                                                  James S. Davidson
13

14                                                Attorneys for Defendant/Counterclaimant
                                                  DIAMOND FOUNDRY INC.
15

16

17  **IT IS SO ORDERED**

18

19  Dated:_____      _____

20                                             Hon. Trina L. Thompson
                                               United States District Judge
21

22

23

24

25

26

27

28

STIPULATION TO AMEND COMPLAINT AND [PROPOSED] ORDER

**EXHIBIT A**

Todd Pickles (SBN CA 215629)
Henry A. Stroud (SBN CA 342479)
GREENBERG TRAURIG, LLP
400 Capitol Mall, Suite 2400
Sacramento, California 95814
Telephone: 916.442.1111
Facsimile: 916.448.1709
picklest@gtlaw.com
henry.stroud@gtlaw.com

Attorneys for Plaintiffs
E.Y. OROT ASSETS LTD. and OMEGA ECO DIAMONDS LTD.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| E.Y. OROT ASSETS LTD., an Israeli company, and OMEGA ECO DIAMONDS LTD., an Israeli company,<br><br>　　　Plaintiffs,<br><br>v.<br><br>DIAMOND FOUNDRY INC., a Delaware corporation,<br><br>　　　Defendant. | CASE NO. 3:24-cv-03836-TLT<br><br>**FIRST AMENDED COMPLAINT FOR DOMESTICATION OF FOREIGN JUDGMENT PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1713, ET SEQ.** |

Plaintiffs E.Y. OROT ASSETS LTD. and OMEGA ECO DIAMONDS LTD. (together, "Plaintiffs" or "Orot" and "Omega"), each an Israeli company, bring this First Amended Complaint pursuant to California's Uniform Foreign-Country Money Judgments Recognition Act (the "Recognition Act") to domesticate a final and binding judgment entered by the Tel Aviv District Court for Plaintiffs and against defendant Diamond Foundry Inc. ("Defendant" or "Foundry").

## THE PARTIES

1.    Plaintiff E.Y. Orot Assets Ltd. is a company organized under the laws of the State of Israel with its principal place of business in the City of Tel Aviv, Israel.

2.    Plaintiff Omega Eco Diamonds Ltd. is a company organized under the laws of the State of Israel with its principal place of business in the City of Tel Aviv, Israel. Orot and Omega are business partner entities.

3.    Defendant Diamond Foundry Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business in the City of South San Francisco, County of San Mateo, in the State of California.

## JURISDICTION AND VENUE

4.    Pursuant to Title 28, United States Code Section 1332, this Court has jurisdiction over this claim because Orot and Omega are each a citizen of a foreign state and Foundry is a citizen of the State of California, and because the amount in controversy exceeds $75,000.

5.    Pursuant to Title 28, United States Code Section 1391, venue is appropriate in this Court because Foundry, the sole defendant, resides in this judicial District.

## NATURE AND SUBSTANCE OF THE CLAIM

6.    The underlying dispute arises from Foundry's failure to perform its obligations under an agreement entitled "Foundry-As-A-Service Agreement" (the "Agreement") executed between Orot and Foundry on October 14, 2020, pursuant to which, *inter alia*, Orot prepaid Foundry a fee of US $2,500,000 (the "Pre-Payment") and committed to purchase from Foundry certain agreed-upon quantities of laboratory-manufactured diamonds satisfying certain agreed-upon quality criteria, for shipment to and sale in the State of Israel.  The Agreement does and did not include any forum selection clause or otherwise preclude litigation of disputes between the contractual parties in Israel. The Agreement did provide for

governing law pursuant to the laws of California and also included a provision, in case of a dispute, requiring mediation prior to commencement of litigation.

7.    On or about March 27, 2022, following lengthy attempts at resolving their differences through friendly discussions, requests for mediation, and eventually through attorney letters, Orot and Omega filed a statement of claims, which is the procedural equivalent to a complaint (hereinafter the "Israeli Complaint"), against Foundry in the District Court of Tel Aviv of the State of Israel ("Israeli District Court").  An English translated copy of the Israeli Complaint is attached as **Exhibit 1.**

8.    In the Israeli Complaint, Plaintiffs alleged claims against Foundry, *inter alia,* for breach of contract, breach of warranty, and false promise under California law, and sought monetary damages in the amount of 15,000,000 New Israeli Shekels, commonly abbreviated as "NIS" (equivalent to approximately US $4.65 million at then-prevailing exchange rates), which sum included the return of the Pre-Payment and certain other additional payments made by or on behalf of Plaintiffs to Defendant, and other monetary damages.

9.    Concurrently with the filing of the Israeli Complaint, Plaintiffs paid to the Israeli District Court a filing fee of NIS 187,500 (approximately US $58,000 at then-prevailing exchange rates) (the "Court Filing Fee") in accordance with Israeli procedural requirements.  In Israel, the Court Filing Fee is calculated as a percentage of the monetary damages claimed.

10.    Together with the Israeli Complaint, Plaintiffs submitted an expert opinion from an attorney licensed to practice in the State of California, Dr. Karni Shagal-Peppercorn, Esq.  The expert opinion concluded that "plaintiffs are entitled, by virtue of the laws of the State of California, to a series of remedies for breach of contract and breach of Warranties by the defendants."  Dr. Shagal-Peppercorn provided a detailed analysis for the Israeli District Court explaining why the claims were valid under California law.

11.    On or about May 11, 2022, the Plaintiffs duly served upon Foundry a professionally translated copy of the Israeli Complaint in accordance with the relevant rules and requirements of the Israeli District Court for extraterritorial service of process.

12.    On or about August 14, 2022, Plaintiffs moved the Israeli District Court to enter default judgment in favor of Plaintiffs and against Foundry because Foundry had failed to file a statement of defense or answer, an objection, or a request for extension of time with the Israeli District Court within the

time period under applicable Israeli procedural law.

13.    On or about August 14, 2022, the Israeli District Court entered judgment for Plaintiffs and against Foundry (hereinafter the "Israeli Default Judgment") in the amount of NIS 15,287,500, plus interest from the date of the judgment.  An English translated copy of the Israeli Default Judgment is attached as **Exhibit 2**.

14.    Plaintiffs caused a copy of the Israeli Default Judgment to be sent to Foundry on or about September 2, 2022.

15.    On or about September 3, 2022, the Israeli District Court received, by facsimile, a letter written in English and signed by Mr. Michael Calonico, who identified himself as Head of Finance of Foundry.  Mr. Calonico claimed that Foundry had attempted to send to the Israeli District Court a response to the Israeli Complaint by express courier in June 2022, and requested that the "Honorable Court" "deny all claims" on various grounds that Mr. Calonico set out in five bullet points.

16.    Thereafter, Foundry hired Israeli counsel. Foundry retained Herzog Fox & Neeman ("Herzog"), a highly reputable Israeli law firm.  According to its website, Herzog employs more than 400 lawyers and has been awarded "more Tier 1 rankings to any other law firm in Israel."  On October 6, 2022, Foundry, through Herzog, filed a motion to set aside the Israeli Default Judgment.

17.    On December 8, 2022, Plaintiffs and Foundry filed in the Israeli District Court a joint stipulation for a stay of proceedings before the Israeli District Court so that the parties could pursue mediation through the JAMS mediation institute.

18.    On May 3, 2023, Plaintiffs and Foundry engaged in mediation with respect to the dispute in front of the Hon. Robert Dondero (Ret.) in San Francisco, California.  Both sides submitted confidential mediation statements and appeared at the mediation meeting through their appointed counsel.  However, the parties were unable to resolve the dispute and the Israeli District Court was thereafter so notified.

19.    On or about June 30, 2023, Defendant notified the Israeli District Court that it was replacing its legal counsel.  Defendants' new counsel was the law firm Yigal Arnon ("Arnon"), a highly reputable Israeli law firm.  According to its website, the Arnon firm employs over 420 lawyers, with litigation among its leading practices.

20.    On or about July 3, 2023, Plaintiffs filed their opposition to Foundry's motion to set aside the Israeli Default Judgment.

21.    On or around July 10, 2023, the parties submitted a joint stipulation to the Israeli District Court, requesting the Court to hold the proceedings in abeyance for 30 days to allow the parties to engage in further settlement discussions (the "July 2023 Stipulation").  At the end of this period, a further joint request was made to lengthen the abeyance for another 30 days.  In addition, the Plaintiffs agreed in the July 2023 Stipulation "that if such settlement discussion does not bear fruit, 20 days will be given to the Defendants from the date of notification of the failure of such settlement discussion, to file a full and exhaustive response to the Plaintiffs' [opposition] to the motion to set aside the judgment (which shall not be limited as to any specific claim) and thereafter, the decision of the Court will be given (to the extent necessary)."

22.    On or about August 17, 2023, the parties jointly notified the Israeli District Court of the failure of their settlement discussions to resolve the case.

23.    On or about September 6, 2023, more than a year after Plaintiffs obtained a judgment against it, Foundry filed its reply to the Plaintiffs' opposition to Foundry's original October 2022 motion to set aside the default judgement.  As a result, Foundry had filed its original motion to set aside the judgement and filed a detailed response to Plaintiffs' opposition.

24.    A hearing date on the motion was then set for October 10, 2023.  Permission was requested and granted for representatives of Foundry to participate from California via the Israeli District Court's audiovisual conferencing system and for a professional interpreter to be present at the hearing.

25.    The Israeli District Court's proceedings where thereafter impacted by the events of October 7, 2023, leading to continuances of the hearing date.

26.    A hearing was conducted on or about January 10, 2024, and an additional hearing was held on or about January 18, 2024.  All parties and their counsel participated in both January hearings.  Transcripts of the hearings were taken and made available to the parties and their counsel.

27.    On or about January 19, 2024, the Israeli District Court issued its findings and an order with respect to Foundry's motion to set aside the Israeli Default Judgment ("January 19, 2024 Decision").  An English translated copy of the January 19, 2024 Decision is attached as **Exhibit 3**.

28.     In the January 19, 2024 Decision, the Israeli District Court reviewed in detail Foundry's arguments to set aside the Israeli Default Judgment.  The court found that Foundry "made light of [Israeli] procedure and even had contempt for it."  In addition, the Israeli District Court found that there were no procedural defects with respect to the Israeli Default Judgment, noting that, notwithstanding Foundry's argument that it had submitted a timely responsive pleading to the Complaint, there was no proof that Foundry had done so.  The Israeli District Court further found that Foundry did nothing to ensure or confirm a timely submission of its statement of defense but rather that Foundry first contacted the Israeli District Court only after it received notice of the Israeli Default Judgment.

29.     In the January 19, 2024 Decision, the court also referred to additional procedural defects with respect to the purported statement of defense, as well as the motion to set aside the Israeli Default Judgment.  The Israeli District Court also concluded that Foundry had not acted in good faith with respect to certain of its arguments, that despite its claim of "ignorance" of the Israeli judicial system, Foundry had hired competent Israeli legal counsel to represent its interests, and that certain of its other arguments lacked merit, lacked evidence, or were vague.  Based upon its findings of fact and its legal analysis, the Israeli District Court held that the Israeli Default Judgment did not contain any legal defect requiring that it be set aside.

30.     The Israeli District Court then considered whether it should nonetheless exercise its discretion to set aside the Israeli Default Judgment.  The court considered the equitable balance and the relative harm that would be sustained by Foundry if the judgement were permitted to stand solely owing to procedural defects in Foundry's handling of the case.  The court referred to Israeli Procedural Rule 131, which permits an Israeli court under certain circumstances to set aside a judgment subject to the satisfaction of certain conditions, including the deposit of up to the full amount of the judgement with the court in advance.  The court noted its preference to give Foundry another opportunity to have its day in court but remained mindful of the "contempt" with which Foundry had treated the process.  In its conclusion, the Israeli District Court saw fit to exercise its discretion to set aside the default judgment (thereby allowing Foundry to restart the case and file a proper statement of defense to the original Complaint), but solely on the condition that Foundry would first deposit with the Israeli District Court, in cash or letter of credit, NIS 3,000,000 (approximately US $810,000 at then-current exchange rates) by no later than February 18, 2024.

31.    On or about February 15, 2024, Foundry appealed the January 19, 2024 Decision to an appellate division of the Israeli District Court (the "Israeli Appellate Court"). Concurrently, Foundry also filed an emergency motion to stay enforcement of the Israeli District Court's decision until the appeal was decided.

32.    On or about February 15, 2024, the Israeli Appellate Court granted Foundry's request for a temporary injunction of enforcement of the judgment until the appeal would be decided.

33.    On or about March 7, 2024, the Plaintiffs responded to Foundry's appeal.

34.    On or about March 12, 2024, Foundry's appeal was denied by the Israeli Appellate Court pursuant to a reasoned, written decision.

35.    The Israeli Appellate Court found that the Israeli District Court properly exercised its discretion in making the cancellation of the Israeli Default Judgment conditional on the deposit of NIS 3,000,000 and the payment of certain court fees, noting that the amount was far less than the total amount of the Israeli Default Judgment. The appellate judge also examined and rejected Foundry's other challenges to the January 19, 2024 Decision. The Israeli Appellate Court did, however, extend the date for Foundry to choose whether to comply with the terms of the January 19, 2024 Decision to March 31, 2024 (the "Final Deadline") by depositing the required funds or letter of credit with the Israeli District Court.

36.    The Final Deadline came and went but at no time did Foundry deposit any funds or letter of credit with the Israeli District Court.

37.    On or about April 10, 2024, the Israeli District Court issued a summary order reflecting its final judgment (the "Final Israeli Judgment"). An English translated copy of the Final Israeli Judgment is attached as **Exhibit 4**.

38.    In the Israeli Final Judgment, the Israeli District Court reaffirmed the Israeli Default Judgment dated August 14, 2022, and ordered a final award to Plaintiffs from Foundry in the amount of NIS 18,794,006.00, consisting of (a) NIS 15,000,000 in damages, plus (b) NIS 3,435,656 in interest accrued since the date of judgment, plus (c) NIS 187,500 as reimbursement for the Court Filing Fee, plus (d) NIS 42,946 in interest accrued on the Court Filing Fee, plus (e) NIS 127,904 of nominal attorneys' fees and expenses.

39.    Based upon the applicable exchange rate, the Final Israeli Judgment equals approximately $5,109,843.94 in U.S. currency.[1]

40.    As of the date of this filing Foundry has not filed any further challenges or appeal of the Final Israeli Judgment, and the time to do so has expired on or about June 18, 2024.

41.    The Plaintiffs seek to domesticate the Final Israeli Judgment by this action.

**FIRST CLAIM FOR RELIEF**

**Domestication of Foreign Judgment**

**Pursuant to California Code of Civil Procedure Section 1713, *et seq.***

42.    Plaintiff hereby incorporates the Paragraphs 1 through 41 as though stated herein.

43.    The Final Israeli Judgment is final, conclusive, and enforceable under Israeli law, and it grants Plaintiff a sum of money, namely, NIS 18,794,006.00.

44.    The Final Israeli Judgment arises out of a claim for breach of contract and is not related to a claim for taxes, a fine or other penalty, or domestic relations.

45.    The Israeli judicial system provides an impartial forum compatible with the requirements of due process of law, including as determined by other courts in the United States.

46.    Defendant availed itself of the Israeli judicial system, including by submitting correspondence to the Israeli District Court and, both directly and through Israeli counsel, filing numerous motions, making appearances, and filing an appeal

47.    The Israeli District Court had personal jurisdiction over Defendant, which was duly served with process, made an appearance and participated in the Israeli litigation.

48.    Additionally, Defendant took the position in its Israeli court filings and appeal that it had filed an answer to the Israeli Complaint.

49.    The Israeli District Court had subject matter jurisdiction over the dispute, which arose as a contractual dispute between an Israeli company and involved the purchase from and shipment of goods to the State of Israel.

---

[1] This exchange rate is based on the U.S. Department of the Treasury Reporting Rates of Exchange dataset, which is published quarterly.  The effective rate provided above is 1 U.S. Dollar to NIS 3.678 as reported on March 31, 2024, the publication date closest to the April 10, 2024, date of judgment.  The treasury's exchange rate converter is publicly available at: https://fiscaldata.treasury.gov/currency-exchange-rates-converter/.

50.    Defendant received notice of the proceeding and appeared in the proceeding.

51.    The Israeli Final Judgment was not obtained by fraud.

52.    The Israel Final Judgment is for breach of contract and is not repugnant to the public policy of the United States or the State of California.

53.    The Agreement did not provide that a dispute predicated on the Agreement would be held in a forum other than an Israeli court.

54.    The forum provided, and Defendant availed itself, of the requirements of due process of law.

55.    The Final Israeli Judgment does not conflict with another final and conclusive judgment.

56.    This action is brought within ten years from the date that the Final Israeli Judgment became effective in Israel.

57.    Domestication of the Final Israeli Judgment is proper under the Uniform Foreign-Country Money Judgments Recognition Act.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs E.Y. Orot Assets Ltd. and Omega Eco Diamonds Ltd. pray for the following relief:

1.    That this Honorable Court recognize, enter, docket, and file the Final Israeli Judgment in the same manner as a judgment of this Court;

2.    That the Court permit enforcement of the Judgment in this District;

3.    That Plaintiff be awarded attorney's fees and costs for bringing this suit as may be permitted by law; and,

4.    For all other relief as the Court may deem just and proper.

Respectfully submitted,

DATED:  January 15, 2025                    GREENBERG TRAURIG, LLP


By _____
                                                    TODD PICKLES
                                                    HENRY A. STROUD
                                                    Attorneys for Plaintiffs
                                                    E.Y. OROT ASSETS LTD. and OMEGA ECO
                                                    DIAMONDS LTD.

**EXHIBIT 1**

**In the district court**                               Civil case ___ 22-03- א

**In Tel-Aviv**

**Regarding:**

> **1. A.I Orot Properties Ltd., Business Number 515082220**
>
> **2. Omega Eco Diamonds Ltd., Business Number 516219675**
>
> 21 Tuval Street, Ramat Gan 5252236
>
> Tel: 054-3975913; Email: eses@zahav.net.il
>
> By Advocate Amit Hadad (LN 62884) and / or Avichai Yehosef (LN 80799)
>
> From Hadad Roth Shenhar Helfer & Co. Law Office
>
> 2 Weizmann Street (Amot Investments) 22nd floor, Tel Aviv
>
> Tel: 03-5333313; Fax: 03-7181112
>
> Email: office@har.law

**The plaintiffs;**

**-Versus-**

> **Diamond Foundry Inc**
>
> 0001853958 Company ID Number
>
> 322 East Grand Avenue
>
> South San Francisco, CA 94080
>
> Tel: 636-5222 (415)
>
> Email: martin@diamondfoundry.com

**The Defendants;**

| | |
|---|---|
| **Substance of the claim:** | Financial |
| **The amount of the claim:** | NIS 23,703,309 (NIS 15,000,000 for taxes purposes) |
| **Taxes:** | NIS 375,000 (Item 8 of the Addendum to the Courts Regulations (Taxes), 2007) |
| **Related Procedures:** | None |

# Statement of Claim

The plaintiffs are hereby honored to submit to the Honorable Court this statement of claim.

All the allegations made in this statement of claim are made cumulatively or alternatively, all according to the context of the matter.

The Honorable Court is requested to accept the claim and order the defendants in the amount of NIS 23,703,309. The plaintiffs will set the total claim at NIS 15,000,000 for taxes purposes.

The Honorable Court is also requested to charge the defendants with the plaintiffs' expenses in respect of this claim, including the attorney's fees, plus linkage and interest and the addition of VAT lawfully.

## Subpoena

Since the plaintiffs filed this statement of claim against you, you are invited to file a statement of defense within sixty days from the date this claim was served on you.

**Please note that if you do not file a statement of defense, then according to Regulation 130 of the Civil Procedure Regulations, 2018, the plaintiffs will have the right to receive a judgment that is not before you.**

## A. A concise description of the litigants

1. Plaintiffs 1, **A.I Orot Properties Ltd.,** is an Israeli company based in Israel, engaged in the import of raw laboratory diamonds, their processing and sale in Israel and around the world. An agreement was signed between the plaintiffs and the defendants for the supply of rough diamonds for a period of five years.

2. Plaintiffs 2, **Omega Eco Diamonds Ltd.,** is an Israeli company based in Israel, engaged in the import of raw laboratory diamonds, their processing and sale in Israel and around the world. The agreement that is the subject of the claim was signed between Plaintiffs 1 and Defendant, but from the very beginning, the actual payment and transfer of the goods was made with Omega (Plaintiffs 2-1 will be hereinafter referred to as: **Plaintiffs**).

3. The Defendant, **Diamond Foundry Inc.,** is a foreign company based in the State of

California in the United States, which grows laboratory diamonds by technological means, which have similar properties to diamonds mined from the ground. The diamonds created by the defendants are essentially identical to the natural diamonds (atomically, molecularly, chemically, visually, in terms of hardness, optical luster, crystalline structure, etc.).

4. The Defendants was founded in 2012, and according to various publications has raised funding of over US $300 million at a company value of US $1.8 billion, from various investors including eBay shopping site founder Jeff School; Twitter founder, Owen Williams and actor Leonardo DiCaprio.

5. According to the Defendants' publications, the technology for producing laboratory diamonds was born from the experience of its founding team acquired over a decade and hundreds of millions of dollars of investment. The Defendants proudly announces that after many years of experimentation, it is able to create "amazing and virgin" diamonds, just like diamonds mined from the ground.

## B. Requested Compensation

6. Based on the factual tract detailed in this statement of claim, the plaintiffs will demand from the defendants a total of NIS 23,703,309 (NIS 15,000,000 for taxes purposes).

## C. A summary of the facts necessary to establish the cause of the claim

7. The basis of the claim is a fundamental, blatant and intentional violation by the defendants of the agreement it signed with the plaintiff, all for the sake of greed.

8. In essence, between the plaintiffs and the defendant, a "contract for periodic deliveries" is concluded for the supply of non-mined rough diamonds (hereinafter: the diamonds and the agreement, respectively), so that the delivery of the goods and payment for them will be spread over a series of separate shipments for five years.

9. This agreement was subsequently made to previous one-time transactions between the parties, in the framework of which the defendants provided the plaintiffs with rough diamonds outside the framework of an ongoing agreement.

10. These one-time transactions were spread over the period between February 2019 and July 2020, during which the plaintiffs purchased from the defendants diamonds in the

total amount of US $676,952, in increasing purchases. These diamonds purchased were of high quality, and their sales went nicely in the Israeli market and in general.

11. However, the defendants were unwilling to continue to supply the plaintiffs with these diamonds as part of one-time transactions, and conditioned the continuation of the business relationship with the plaintiffs on the signing of a standard contract that included a commitment to a long-term purchase for a period of five years.

12. Due to the Defendants' demand, and based on the quality of the previous shipments, the plaintiffs agreed to sign the agreement and with its signing transferred a total of US $2,500,000. This amount guarantees the plaintiffs that they will be given the right to purchase 1,250 carats of diamonds each month at a pre-determined contract price for 60 months (hereinafter: **supply commission** or **down payment**, and in the language of the contract Supply Capacity Fee).

13. The defendants stated that these were "amazing" and "virgin" diamonds, "just like diamonds mined from the ground," and the agreement was signed, among other things, subject to these statements. Also, in the agreement between the parties, the defendants undertook that "**all products shall meet the specifications set out in the Annex and shall be free from defects in material, workmanship, design and manufacture**" (Article 2.5 of the Agreement). Thus, the defendants undertook that the color of the diamonds would not be less than the contractual standard agreed upon.

14. However already in the first shipment received by the plaintiffs in stark contrast to the contractual agreement, the defendants provided the plaintiffs with poor quality diamonds. The color of the diamonds was much inferior to the standard set in the agreement.

15. After the plaintiffs realized that the diamonds provided in the first shipment fall short of their average quality of the agreed quality (as well as the quality of the diamonds provided by the defendants in the past, prior to entering into the agreement), the plaintiffs informed the defendants of the discrepancy between the agreement and the diamonds actually received.

16. The defendants recognized that the diamonds they supplied did not meet the standard set forth in the contract, and therefore undertook to replace them with those that would

meet the standards set forth in the agreement.

17. The plaintiffs granted the defendants' request to repair the defect by replacing the defective goods in subsequent shipments, however time after time (after time), despite all the many opportunities given to the defendants to rectify the breach, the defendants continued to provide the plaintiffs with poor quality diamonds that did not match the required quality in accordance with the agreement between the parties.

18. In circumstances where the breach was not remedied by the defendants, and this despite many opportunities given to them to remedy the breach, the plaintiffs was left with no choice but to notify the termination of the engagement with the defendants.

19. Thus, after eight shipments in which the average diamond quality fell short of the agreement, and after the plaintiffs realized that the Defendants' repeated promises to ship goods that met the terms of the agreement would not be fulfilled, the plaintiffs informed of the rejection of the goods that did not meet the terms of the contract and asked to stop the remaining shipments under the agreement (about 50), clarifying that the defendants can collect their defective goods. It will be clarified that the defendants did not send any additional payment demands after the eight shipments.

20. The plaintiffs further requested to enter into negotiations with the defendants to terminate the engagement, and alternatively to activate the mediation mechanism set forth in the agreement.

21. The defendants' CFO, Mr. Michael Clonico, responded to Plaintiffs' request, claiming that previous shipments had technically met the contractual standard (contrary to the defendants' prior recognition of poor diamond quality).

22. The defendants boasted in their reply and informed the plaintiffs that if they will not receive the defendants' next shipment, the defendants would have no further obligation to the plaintiffs, and that they would be able to retain all of the payments made to them by the plaintiffs.

23. The plaintiffs replied to the defendants' letter, noting that they rejecting their claims, and had in their possession clear evidence that the diamonds sent to them had adversely deviated from the standard set out in the contract. In these circumstances, the plaintiffs reiterated their demand to activate the mediation mechanism set forth in

the agreement.

24. However, this letter from the plaintiffs remained unanswered, all this despite the defendants' representative admitting that there was a defect in the diamond production process.

25. **Thus, an absurd situation arises in which the plaintiffs are between a rock and a hard place (in a tight spot) since the defendants holds a total of US $2,500,000, which is NIS 8,460,000 (!), The down payment transferred to them by the plaintiffs, without providing diamonds to the plaintiffs, and without allowing the plaintiffs to cancel the agreement.**

26. **In fact, the defendants have done justice to themselves when they hold in their hands many (many) millions that are not theirs, literally. This is without providing an explanation to the plaintiffs as to why they are doing so, without allowing the plaintiffs to receive goods for the large sum of money paid to them and without allowing the plaintiffs to cancel the agreement.**

27. In view of the blatant breach of the agreement, which caused and continues to cause severe damages to the plaintiffs, and in view of the defendants' disregard of the references to it, the plaintiffs were left with no choice but to file the claim against the defendants.

28. The Honorable Court will be asked to order the defendants to reimburse the plaintiffs for the delivery fee paid to them for goods never received, and to order adequate compensation for the damages caused to the plaintiffs in respect of the defective goods received from the plaintiffs, with an emphasis on the defendants' unscrupulous conduct.

## D. The facts that give authority to the court

29. The Honorable Court has substantive jurisdiction due to the amount of the claim, and the local jurisdiction to hear the claim is vested in the Honorable Court, in view of the place where the engagement was made, and because the contract, in whole or in part, was either violated within the state or the possibility of its existence was denied.

# E. Details of the claims

### E(1). About artificial laboratory diamonds and the criteria for determining their quality

30. Before we go into depths on the issue of the defendants' liability to the plaintiffs, here is the place to explain what artificial lab diamonds are, and how their quality is determined according to various metrics.

31. Laboratory diamonds are man-made diamonds that are created by technological means, in contrast to natural diamonds that are created in nature in geological processes. In fact, laboratory diamonds have the same chemical, physical, and optical properties as earth-derived diamonds, except that they are man-made.

32. In laboratory conditions, the surface conditions in which the natural diamonds are formed are restored, when these surface conditions include pressure and very high temperatures. Thus, instead of waiting for ages, diamonds can be produced quickly and in a controlled manner, and at a much more attractive price to the end consumers.

33. Laboratory diamonds can be produced by two main methods. One, the growth of diamonds in a controlled environment of extreme pressure and heat, known as high-temperature (HPHT); The second, in the plasma stratification method (chemical vapor deposition -CVD).

34. The defendants grow their diamonds using the CVD method, one of the advantages of which is that larger diamonds can be produced from it than other methods of growing laboratory diamonds.

35. As stated, the defendants manufacture laboratory diamonds by technological means, and according to its publications, the technology for producing laboratory diamonds was born from the experience of its founding team acquired over a decade and hundreds of millions of dollars of investment.

36. Thus, according to the defendants' publications, after most of their early experiments failed, and after years, they were able to create the conditions under which nature creates a diamond itself. The defendants proudly advertise that they are capable of

creating "amazing and virgin diamonds, just like diamonds mined from the ground." A copy of the defendants' publication is attached as <u>Appendix 1</u>;

37. To understand the severity of the breach of agreement between the parties to the claim, which will be detailed in the next subsection, we must consider the key parameters whose combination serves as an estimate for assessing the nature and value of the diamond. These parameters refer to the rating of the weight, color, and cleanliness of the diamonds.

38. After the weight of the diamond, the **<u>color</u>** of the diamond is the most important feature, in gems in general and diamonds in particular, and therefore it is one of the main key factors in assessing the value of a diamond.

39. The color of the diamonds ranges from a complete lack of color (color rating D) which is the best color to shades of yellow and brown (letter rating goes up to Z which expresses a strong hue of the color of the diamond). This rating is accepted in the diamond market, and is determined by the American Gemological Institute (GIA). For convenience, an illustration diagram is shown below:



40. In the chart above it can be seen that the letter D symbolizes the highest quality diamond in terms of color (clear and colorless by definition), and as you progress on the graph from left to right, the quality of the diamond colors decreases until it is symbolized by the letter Z.

41. The plaintiffs, on the basis of their many years of experience, performs a significant part of their diamonds color enhancement treatment using heat and high pressure known as HPHT (High Pressure High Temperature). This process exposes the diamond to high pressure and temperature, which cause the diamond to change its

color, thus making it a diamond with a more attractive color that is easier to sell.

42. In fact, this process enhances the color of the diamonds on several levels. For example, in the vast majority of cases, a diamond that was colored K or L will turn, after a color enhancement treatment, into a diamond that is colored H or I.

43. While improving the color of the diamonds increases their chances of being sold, at the same time, diamonds that have undergone a post-growth color enhancement process are required to be properly reported and discovered, and gemological certificates from the International Gemological Institute (IGI) will indicate that a diamond has undergone post-growth processing, as follows:

> **"Comments: This Laboratory Grown Diamond was created by Chemical Vapor Deposition (CVD) <u>growth process and may include post-growth treatment</u>".**

A copy of a sample IGI certificate is attached as <u>Appendix 2</u>;

44. As long as the diamond has not undergone a color enhancement process after its growth, the certificate will state that:

> **"Comments: As Grown - <u>No</u> indication of post growth treatment".**

A copy of a sample IGI certificate is attached as <u>Appendix 3</u>;

45. Here it is worth noting that the plaintiffs sent some of their diamonds purchased from the defendants also to KJ & Company which is based in India, polishing and enhancing the colors of the diamonds, which was recommended by the defendants.

46. It will be noted that there are other processes designed to improve the diamond (such as "glaze treatment", "laser drilling", etc.) but these are not of interest to us, and are not relevant to the diamonds that are the subject of the claim.

47. Another key parameter that affects the value of a diamond is its level of cleanliness. This property ranks the level of defects present in a diamond (referring to inclusions found in a diamond which are a substance found within the diamond but does not constitute a fundamental component of it). The clearer and more flawless a diamond

is, the higher its value and the higher the quality.

48. The cleaning rating is divided into five main quality groups. For convenience, an illustration diagram is shown below:



| FL, IF | VVS1, VVS2 | VS1 | VS2 | SI1 | SI2, SI3 | I1 ,I2 ,I3 |

INTERNALLY FLAWLESS | VERY VERY SLIGHTLY INCLUDED | VERY SLIGHTLY INCLUDED | SLIGHTLY INCLUDED | INCLUDED

49. In the chart above, it can be seen that the first quality group is symbolized by the combinations of the letters FL (flawless) and IF (internally flawless) and it ranks the cleanest diamonds available in the world. The second quality group is symbolized by the combinations of the letters VVS1 (very very slight inclusions) and VS1 (very slight inclusions) and it refers to diamonds with a very high degree of purity in which the particles are very small and barely discernible.

50. The third and fourth quality groups are symbolized by the combinations of the letters VS1 to SI3 and it refers to diamonds of medium-high to low purity; The fifth quality group is symbolized by the combinations of the letters I1 to I3 and refers to diamonds in the lowest degrees of purity and with the lowest value.

51. The defendants undertook in the agreement that the diamonds to be supplied to the plaintiff would be of a quality grade not less than the VS2 level, with no exceptions being recorded in this regard.

52. It should be noted that as much as there is a "hue/shade" in a diamond, it has to do with **its color** and not the level of its cleanliness. Thus, in the claim, as will be explained in detail below, the most significant deviation with respect to the contractual standard set is regarding the color of the diamond (and not its purity/cleanliness), for the diamonds received by the plaintiffs were of a much lower standard than promised, while having brown and gray shades/hues which severely impair the quality, marketability and value of the diamonds.

**E(2). The background to the signing of the agreement and the pre-contractual**

**presentations presented to the plaintiffs**

53. In light of the defendants' publications as detailed above, the plaintiffs decided to purchase laboratory diamonds from the defendants **for the first time** in early 2019:

    A. In February 2019, the plaintiffs purchased from the defendants diamonds weighing 101.53 carats for a total of US $35,535.50 (a price that reflects a total of US $350 per carat).

    A copy of the purchase invoice dated 22.2.2019 is attached as <u>Appendix 4</u>;

    B. In March 2019, the plaintiffs purchased from the defendants diamonds weighing 200.08 carats for a total amount of US $50,020 (a price that reflects a total of US $250 per carat).

    A copy of the purchase invoice dated 15.3.2019 is attached as <u>Appendix 5</u>;

    C. In December 2019, the plaintiffs purchased from the defendants diamonds weighing 201.9 carats for a total of US $50,475 (a price reflecting a total of US $250 per carat).

    A copy of the purchase invoice dated 3.12.2019 is attached as <u>Appendix 6</u>;

    D. In the same month, the plaintiffs purchased from the defendants additional diamonds weighing 512.04 carats for a total of US $128,010 (a price that reflects a total of US $250 per carat).

    A copy of the purchase invoice dated 18.12.2019 is attached as <u>Appendix 7</u>;

    E. In February 2020, the plaintiffs purchased from the defendants 507.69 carat diamonds totaling $101,754.75 (a price that reflects a total of $200 per carat).

    A copy of the purchase invoice dated 12.2.2020 is attached as <u>Appendix 8</u>;

    F. In May 2020, the plaintiffs purchased from the defendants diamonds weighing 515.76 carats for a total of US $90,428.75 (a price that reflects a total of US $175 per carat).

    A copy of the purchase invoice dated 29.5.2020 is attached as <u>Appendix 9</u>;

    G. In July 2020, the plaintiffs purchased from the defendants diamonds weighing 1,103.64 carats for a total of US $220,728 (a price reflecting a total of US $200

per carat).

A copy of the purchase invoice dated 7.7.2020 is attached as <u>Appendix 10</u>;

54. During the period from February 2019 to July 2020, the plaintiffs purchased from the defendants, diamonds totaling US $676,952, in increasing purchases.

55. These diamonds purchased were polished by the plaintiffs to a size exceeding 2 carats, they were of **<u>high quality and color not less than I</u>**, and their sales were good in the Israeli market (since after color enhancement treatment, most of the diamonds were not less than G).

56. Accordingly, the plaintiffs sought to continue to purchase high quality diamonds of the same type from the defendants. But at this point in time, the defendants conditioned the continuation of the business relationship with the plaintiffs on the signing of a long-term commitment for a period of five years.

57. Due to the defendants' demand, and based on the quality of the previous shipments, the plaintiffs agreed to sign the agreement. Here it is pertinent to note that although the plaintiffs sought to make such and such changes to the agreement, the defendants did not allow it, and in fact presented the plaintiffs with **a standard contract** for signing without any possibility of making any changes.

## E(3). The agreement signed between the parties

58. On 14.10.2020, the plaintiffs entered into an agreement with the defendants for a multi-year monthly supply of non-mined rough diamonds.
A copy of the agreement signed between the parties dated 14.10.2020 and the transfer of the down payment attached as <u>Appendix 11</u>;

59. Under the agreement (clause 2.1 and Appendix A to the agreement), the defendants undertook to supply the plaintiffs with 1,250 carats each month, for five years, at a decreasing price each year (and a total of 60 shipments totaling 75,000 carats in total). For example, the price in the second year will be 90% of the price in the first year, the price in the third year will be 81% of the price in the first year and so on.

60. As for the payment, the contract stipulates that the plaintiffs will transfer a delivery fee of US $2,500,000 which will buy them the "right" to receive a fixed supply of

rough diamonds at a discounted price. Under this condition, the plaintiffs will pay US $2,500,000 for a total of 75,000 carats for five years. Thus, on the contract price (US $145 in the first year) the plaintiffs will pay an additional US $33 per carat for the right to purchase the diamonds at the price specified in the contract.

61. The price of the diamonds sent each month is determined in the appendix to the contract, at a fixed annual price, with the payment for each shipment being made in advance, **before** its actual transfer.

62. For example, if the defendants are to deliver 1,255 carats in a given month, the plaintiffs are required to pay in advance a price of US $145 per carat in the first year of the contract, in addition to the amount of US $33 already paid, for each carat (delivery fee charged from the down payment paid), and after receiving the payment the defendants send the goods to Israel.

63. Section 2.5 of the contract entitled "Specifications, Title, Returns and Warranties" states that all diamonds shall meet the quality specifications set out in the Appendix to the contract, and that they shall be free from any defect in material, workmanship, design or production. The section further stated that unless otherwise agreed in the contract or otherwise, the sale of the goods is "as is" and is not subject to replacements or returns.

64. In Appendix A to the agreement, the defendants undertook to supply the plaintiffs with diamonds in colors E and F at a price of US $225 per carat; And colors H and I at a cost of US $145 per carat. That is, the defendants undertook to supply the plaintiffs with diamonds in colors not less than a color classified by the American Gemological Institute as I, **prior** to treatment for color enhancement.

65. And note that; The plaintiffs agreed to sign a long-term agreement, and to transfer a significant advance of US $2,500,000, solely in light of the plaintiffs' assurances that the diamonds supplied to them will be of a level of quality that does not fall, and even exceed, the deliveries of the diamonds supplied to them during the two years preceding the signing of the agreement. This is in accordance with the fact that the

plaintiffs will continue to polish their diamonds exactly as they did before the contract.

66. But promises aside and reality aside.

67. Upon receiving the first shipment of diamonds subject to the agreement, it became clear to the plaintiffs that the quality of the diamonds was far inferior to the diamond shipments received from the defendants in the past, prior to signing the agreement, and from what was agreed in the agreement between the parties. The color of the diamonds did not meet the standards set out in the agreement, to which the defendants undertook.

68. Before explaining the extreme discrepancy between the quality of the diamonds defined in the agreement and the diamonds sent to the plaintiffs, it will be clarified that the rough diamonds that arrive in Israel from the defendants undergo various processing processes for conversion from a rough diamond to a polished diamond.

69. As stated, the rough diamonds obtained from the defendants are sent for polishing and refining processes in India. The diamonds are then transferred to a laboratory of the International Gemological Institute (IGI) for the purpose of producing a certificate that rates the quality of the diamonds. A diamond rating report is an official document from a laboratory that details all the qualities of the diamond and includes all the information about it.

70. This process takes about two months, and only when the diamonds return to Israel, and only then, does the plaintiffs first become aware of the quality of the diamonds in the shipment.

71. That is, since in accordance with the agreement each month a new shipment is sent to the plaintiffs, and due to the length of the processing processes that the diamonds must go through, the plaintiffs may receive several shipments until they become aware of the quality of the earlier shipments.

72. Thus, only after two months from the date of receipt of the first shipment received subject to the agreement, and only after receipt of the second shipment, did the plaintiffs realized that the quality of the first shipment was poor and did not meet the

standard set in the agreement between the parties.

**E(4). Defects in the goods that reached the plaintiffs after the signing of the agreement**

73. We will now turn to detail the defects in the goods that reached the plaintiffs after signing the agreement (for the avoidance of doubt it will now be clarified that for convenience the weight of the diamonds is stated in their gross weight, however these were sold by the plaintiffs as polished diamonds).

74. **The first shipment** of the diamonds reached the plaintiffs during the month of October 2020, and included 190 diamonds with a total weight of 1,241.6 carats, for which the plaintiffs paid a total of US $275,084.90.[1]
A copy of the payment invoice dated 20.10.2020 is attached as <u>Appendix 12</u>;
A copy of the bank transfer from the plaintiffs to the defendants dated 21.10.2020 is attached as <u>Appendix 13</u>;

75. On 29.10.2020 and 2.11.2020 the plaintiffs sent the diamonds received in shipment to Facets Virtue and KJ & Company in India that are polishing and enhancing the colors of the diamonds.
A copy of the reference on diamond exports to India dated 29.10.2020 is attached as <u>Appendix 14</u>;

76. On 2.12.2020 and 17.2.2021, diamonds in Israel were received from Facets Virtue and KJ & Company, following the polishing and refinement work in India.
A copy of the reference to the receipt of the diamonds in Israel dated 2.12.2020 and 17.2.2021 is attached as <u>Appendix 15</u>;

77. But to the plaintiffs' astonishment, only 94 diamonds in this shipment (about 49%) met the contractual standard (i.e., a color not less than I according to the American Gemological Institute rating). All other diamonds (about 51%) were in a color grade lower than I (before the color enhancement treatment) or cracked diamonds that were not suitable for processing.

78. In view of these dismal figures, 83 diamonds were not sold at all by the plaintiffs due

---

[1] This price reflects a total of US $221.5 per carat. After signing the agreement, the price paid was adjusted to the contract price. Thus, deducted from the down payment paid a total of US $95,052.9.

to their poor quality (due to non-standard hues/shades in diamonds).

79.  In fact, diamonds weighing 519.36 carats (raw) were not sold due to their poor quality. For this merchandise, the plaintiffs paid a total of US $161,520.[2]

If the defendants had met the standard set in the contract, these diamonds would have been sold to consumers at a total price of US $354,840. The plaintiffs were thus denied a profit of US $193,320, for the diamonds received from the plaintiffs but not sold.

80.  As for the diamonds sold in this shipment, their total weight was 687.56 (raw) and they were sold for a total of US $340,348. However, if the plaintiffs had met the standard set in the contract, these diamonds would have been sold for $424,988, thereby depriving the plaintiffs of a profit of $84,640.

81.  In total, in this shipment the plaintiffs were denied a profit of US $277,960.

82.  **The second shipment** of diamonds reached the plaintiffs during November 2020, and included 192 diamonds with a total weight of 1,246.45 carats, for which the plaintiffs paid a total of US $180,735.25 (price reflecting US $145 per carat, as agreed in Appendix A to the agreement between the parties).

A copy of the payment invoice dated 11/23/2020 is attached as Appendix 16;

A copy of the bank transfer from the plaintiffs to the defendants dated 24.11.2020 is attached as Appendix 17;

83.  On 7.12.2020 and 10.12.2021 the plaintiffs sent the diamonds received in shipment to Rishabh Diam and KJ & Company in India, polishing and refining the colors of the diamonds.

A copy of the reference on diamond exports to India dated 7.12.2020 and 10.12.2020 is attached as Appendix 18;

84.  On 3.2.2021 and 5.2.2021 the diamonds in Israel were received from Rishabh Diam and KJ & Company after the polishing and refinement works in India.

A copy of the reference to the receipt of the diamonds in Israel dated 3.2.2021 and 5.2.2021

---

[2] The calculation was made as follows: US $221 is the price per carat in addition to US $90 (on average) per carat, which is a payment for wages, the polishing process, the color improvement process, the production of gemological certificates, transfer taxes, etc.

is attached as <u>Appendix 19</u>;[3]

85. Again, to the plaintiffs' astonishment, only 78 diamonds in this shipment (about 40%) met the contractual standard (i.e., a color not less than I according to the American Gemological Institute rating). All the other diamonds, about 60% of the shipment, were of a color grade lower than I (before the color enhancement treatment) or cracked diamonds that were not suitable for processing.

86. In view of these dismal figures, 50 diamonds were not sold at all by the plaintiffs due to their poor quality (due to non-standard shades in diamonds).

87. In fact, diamonds weighing 857.34 carats (raw) were not sold due to their poor quality. For this merchandise, the plaintiffs paid a total of $229,767. [4] If the defendants had met the standard set in the contract, these diamonds would have been sold to consumers for a total price of US $521,300. The plaintiffs thereby were denied a profit of US $291,533, for the diamonds received but not sold.

88. As for the diamonds sold in this shipment, their total weight was 369.25 (raw) and they were sold for a total of US $218,172. However, if the plaintiffs had met the standard set in the contract, these diamonds would have been sold for $239,332. This would have prevented the plaintiffs from making a profit of $21,160.

89. In all, in this shipment the plaintiffs were denied a profit of US $312,693.

90. On December 17, 2020, about two months after receiving the first shipment, after realizing to the plaintiffs the poor quality of the diamonds, the plaintiffs' representative, Mr. Eli Ilizarov, contacted Mr. Rito Rag, the Defendants' VP of Marketing, with whom all the contact between the parties was conducted (Including

---

[3] Regarding references regarding the export and import of diamonds, it should be noted that sometimes in one shipment diamonds are sent for polishing from previous shipments received, or are received by delaying diamonds after polishing so that they are included in later shipments from the date they were shipped.

[4] The calculation was made as follows: US $145 constitutes the contract price per carat, in addition to US $33 (on average) per carat which constitutes a delivery fee, in addition to US $90 (on average) per carat which is a payment for wages, the polishing process, the process of color enhancement, the production of gemological certificates, transfer taxes and so on. This calculation is valid for deliveries 7-2.

the negotiations leading up to the signing of the agreement and the actual signing).

91. In the same conversation, the plaintiffs' representative argued that the quality of the diamonds was significantly lower than usual, that it did not meet the contractual standard and that there were many shades of gray and brown in the diamonds shipped as never before.

92. The defendants' representative replied to the plaintiffs' representative that he was aware of the problem, and that he would make sure to replace the plaintiffs with all the diamonds with the shades, and also make sure to fill in the blanks, and the defendants would take care of sending the plaintiffs other good goods instead of defective goods.

93. In another conversation on 24.3.2021, after it became known that the second shipment was also mostly defective, the defendants' representative again admitted that there was some defect in the production process, and that he said " everything will work out".

94. In January 2021, after receiving the results from the first two shipments, the defendants' representative pledged to the plaintiffs' representative that the defendants would supply the plaintiffs within two months with only high-quality diamonds (grades D, E, F), promising that "everything will work out".

95. The defendants, who acknowledged that the diamonds they sent to the plaintiffs did not meet the required quality also promised to send an alternative shipment of diamonds that matched the details of the agreement. That is, upon the plaintiffs' notice to the defendants about the non-conformity, the defendants admitted the problem and promised that it would be rectified in subsequent shipments.

96. **The third shipment** of diamonds reached the plaintiffs during December 2020, and included 190 diamonds with a total weight of 1,244.45 carats, for which the plaintiffs paid a total of US $180,445.25 (price reflecting US $145 per carat, as agreed in Appendix A to the agreement between the parties).
A copy of the payment invoice dated 17.12.2020 is attached as Appendix 20;
A copy of the bank transfer from the plaintiff to the defendant dated 20.12.2020 is attached as Appendix 21;

97. On 31.12.2020 and 4.1.2021 the plaintiffs sent the diamonds received in shipment to

the Atash Star Impex and Rishabh Diam companies in India, polishing and refining the diamond colors.

A copy of the reference on diamond exports to India dated 31.12.2020 and 4.1.2021 is attached as <u>Appendix 22</u>;

98. On 18.2.2021 and 10.3.2021, diamonds in Israel were received from Atash Star Impex and Rishabh Diam, following the polishing and refinement work in India.

A copy of the reference to the receipt of the diamonds in Israel on 18.2.2021 and 10.3.2021 is attached as <u>Appendix 23</u>;

99. But this time, also, the plaintiffs was astonished to find that only 57 diamonds in this shipment (about 30%) met the contractual standard (i.e., a color not less than I according to the American Gemological Institute rating). All the other diamonds, about 70% of the shipment, were of a color grade lower than I (before the color enhancement treatment) or cracked diamonds that were not suitable for processing.

100. In view of these dismal figures, 108 diamonds were not sold at all by the plaintiffs due to their poor quality (due to non-standard shades in diamonds).

101. In fact, diamonds weighing 696.93 carats (raw) were not sold due to their poor quality. For this merchandise, the plaintiffs paid a total of US $186,777. If the defendants had met the standard set in the contract, these diamonds would have been sold to consumers for a total price of US $473,965. The plaintiffs were thus denied a profit of US $287,188, for the diamonds received from the defendants but not sold.

102. As for the diamonds sold in this shipment, their total weight was 482.38 (raw) and they were sold for a total of US $213,489. However, if the plaintiffs had met the standard set in the contract, these diamonds would have been sold for US $269,731. The plaintiffs were thus denied a profit of US $56,242.

103. In all, in this shipment, the plaintiffs were denied a profit of US $343,430.

104. **The fourth shipment** of diamonds reached the plaintiffs during January 2021, and included 190 diamonds with a total weight of 1,250.48 carats, for which the plaintiffs paid a total of US $181,319.60 (price reflecting US $145 per carat, as agreed in

Appendix A to the agreement between the parties).

A copy of the payment invoice dated 20.1.2021 is attached as <u>Appendix 24</u>;

A copy of the bank transfer from the plaintiffs to the defendants dated 25.1.2021 is attached as <u>Appendix 25</u>;

105. On 1.2.2021 and 11.2.2021 the plaintiffs sent the diamonds received in shipment to Rishabh Diam and S&S International in India, polishing and refining the diamond colors.

A copy of the reference on diamond exports to India dated 1.2.2021 and 11.2.2021 is attached as <u>Appendix 26</u>;

106. On 11.5.2021 and 27.5.2021, the diamonds were received in Israel from Rishabh Diam and S&S International, following the polishing and refining work in India.

A copy of the reference to the receipt of the diamonds in Israel on 11.5.2021 and 27.5.2021 is attached as <u>Appendix 27</u>;

107. Once again, the plaintiffs were surprised to find that only 37 diamonds in this shipment (approximately 19%) met the contractual standard (i.e., a color not less than I according to the American Gemological Institute rating). All other diamonds, about 81% of the shipment, were grade I lower than I (before the color enhancement treatment) or cracked diamonds that were not suitable for processing.

108. In view of these dismal figures, 99 diamonds were not sold at all by the plaintiffs due to their poor quality (due to non-standard shades in diamonds).

109. In fact, diamonds weighing 887.25 carats (raw) were not sold due to their poor quality. For this merchandise, the plaintiffs paid a total of US $237,783. If the defendants had met the standard set in the contract, these diamonds would have been sold to consumers at a total price of US $691,646. The plaintiffs were thus denied a profit of US $453,863, for the diamonds received from the defendants but not sold.

110. As for the diamonds sold in this shipment, their total weight was 363.23 (raw) and they were sold for a total of US $147,538. However, if the plaintiffs had met the standard set in the contract, these diamonds would have been sold for US $202,989.

The plaintiffs were thus denied a profit of US $55,451.

111. In all, in this shipment the plaintiffs were denied a profit of $376,818.

112. **The fifth shipment** of diamonds reached the plaintiffs during February 2021, and included 190 diamonds with a total weight of 1,243.85 carats, for which the plaintiffs paid a total of US $180,358.25 (price reflecting US $145 per carat, as agreed in Appendix A to the agreement between the parties).
A copy of the payment invoice dated 22.2.2021 is attached as <u>Appendix 28</u>;
A copy of the bank transfer from the plaintiff to the defendant dated 24.2.2021 is attached as <u>Appendix 29</u>;

113. On 8.3.2021, 5.4.2021 and 26.4.2021 the plaintiffs sent the diamonds received in shipment to Rishabh Diam and D Impex companies in India, polishing and enhancing the colors of the diamonds.
A copy of the reference on the export of diamonds to India dated 8.3.2021, 5.4.2021 and 26.4.2021 is attached as <u>Appendix 30</u>;

114. On 11.5.2021, 21.5.2021 and 8.7.2021, diamonds in Israel were received from Rishabh Diam and D Impex companies, following the polishing and refining work in India.
A copy of the reference to the receipt of the diamonds in Israel on 11.5.2021, 21.5.2021 and 8.7.2021 is attached as <u>Appendix 31</u>;

115. Once again, the plaintiffs were surprised to find that only 51 diamonds in this shipment (approximately 27%) met the contractual standard (i.e., a color not less than I according to the American Gemological Institute rating). All other diamonds, about 73% of the shipment, had a grade lower than I (before the color enhancement treatment) or cracked diamonds that were not suitable for processing.

116. In view of these dismal figures, 58 diamonds were not sold at all by the plaintiffs due to their poor quality (due to non-standard shades in diamonds).

117. In fact, diamonds weighing 389.91 carats (raw) were not sold due to their poor quality. For this merchandise, the plaintiffs paid a total of US $104,495. If The defendants had met the standard set in the contract, these diamonds would have been sold to consumers at a total price of US $270,633. The plaintiffs were thus denied a profit of

US $166,138, for the diamonds received from the defendants but not sold.

118. As for the diamonds sold in this shipment, their total weight was 853.5 carats (raw) for a total of US $247,834. If the plaintiffs had met the standard set in the contract, these diamonds would have been sold for US $430,965. The plaintiffs were thus denied a profit of US $183,131. [5]

119. Overall, in this shipment the plaintiffs were denied a profit of US $219,269.

120. After the five shipments none of which met the contractual standard (diamonds that are no less than I colored). Therefore, the defendants decided to transfer another shipment to the plaintiffs **free of charge**, while promising that this shipment would meet the standard set forth in the contract, as compensation for the damages caused in the previous shipments.

121. **The sixth shipment** of the diamonds reached the plaintiffs during the month of April 2021, and included 178 diamonds with a total weight of 1,111.55 carats (for this shipment the plaintiffs did not pay as these were diamonds sent as compensation for the previous shipments).

A copy of the payment invoice dated 8.4.2021 is attached as Appendix 32;

122. On 22.4.2021 and 26.4.2021 the plaintiffs sent the diamonds received in shipment to KJ & Company and D Impex in India, polishing and enhancing the colors of the diamonds.

A copy of the reference on the export of diamonds to India dated 22.4.2021 and 26.4.2021 is attached as Appendix 33;

123. On 8.7.2021 and 29.7.2021 the diamonds in Israel were received from KJ & Company and D Impex, after the polishing and refining work in India.

A copy of the reference to the receipt of the diamonds in Israel on July 8, 21 and July 29, 21 is attached as Appendix 34;

124. However once again, disappointingly, only 34 diamonds in this shipment (about 19%)

---

[5] 302 carats (raw) were sold in Israel for a total of US $126,504; 551.5 carats (raw) were sold in India for US $121,330.

met the contractual standard (i.e., a color not less than I according to the American Gemological Institute rating). All other diamonds, about 81% of the shipment, were grade I lower than I (before the color enhancement treatment) or cracked diamonds that were not suitable for processing.

125. In view of these dismal figures, 86 diamonds were not sold at all by the plaintiffs due to their poor quality (due to non-standard shades in diamonds).

126. **The seventh shipment** of diamonds reached the plaintiffs during April 2021, and included 193 diamonds with a total weight of 1,249.76 carats, for which the plaintiffs paid a total of US $181,215.20 (price reflecting US $145 per carat, as agreed in Appendix A to the agreement between the parties).
A copy of the payment invoice dated 22.4.2021 is attached as Appendix 35;
A copy of the bank transfer from the plaintiffs to the defendant dated 26.4.2021 is attached as Appendix 36;

127. On 6.5.2021 the plaintiffs sent the diamonds received in shipment to Rishabh Diam and Atash Star Impex companies in India, polishing and enhancing the colors of the diamonds.
A copy of the reference on diamond exports to India dated 6.5.2021 is attached as Appendix 37;

128. On 29.7.2021 and 18.8.2021 the diamonds in Israel were received from Rishabh Diam and Atash Star Impex, after the polishing and refining work in India.
A copy of the reference to the receipt of the diamonds in Israel on July 29, 21 and August 18, 2120 is attached as Appendix 38;

129. Once again, disappointingly, only 47 diamonds in this shipment (about 24%) met the contractual standard (i.e., a color not less than I according to the American Gemological Institute rating). All other diamonds, about 76% of the shipment, had a grade lower than I (before the color enhancement treatment) or cracked diamonds that were not suitable for processing.

130. In view of these dismal figures, 119 diamonds were not sold at all by the plaintiffs due to their poor quality (due to non-standard shades in diamonds).

131. In fact, diamonds weighing 787.15 carats (raw) were not sold due to their poor quality.

For this merchandise, the plaintiffs paid a total of US $210,956. If the defendants had met the standard set in the contract, these diamonds would have been sold to consumers at a total price of US $528,409. The plaintiffs were thus denied a profit of US $317,453, for the diamonds received from the defendants but not sold.

132. As for the diamonds sold in this shipment, their total weight was 472.12 (raw) and they were sold for a total of US $183,063. However, if the plaintiffs had met the standard set in the contract, those diamonds would have been sold for US $256,186, thereby depriving the plaintiffs of a profit of US $73,123.

133. In all, in this shipment the plaintiffs were denied a profit of US $390,576.

134. **The eighth shipment** of the diamonds reached the plaintiffs during May 2021, and included diamonds with a total weight of 1,288.14 carats, for which the plaintiffs paid a total of US $186,780.30 (price reflecting US $145 per carat, as agreed in Appendix A to the agreement between the parties).
A copy of the payment invoice dated 23.5.2021 is attached as Appendix 39;
A copy of the bank transfer from the plaintiffs to the defendants dated 25.5.2021 is attached as Appendix 40;

135. On 10.6.2021 the plaintiffs sent the diamonds received in shipment to Rishabh Diam companies in India, polishing and enhancing the colors of the diamonds.
A copy of the reference on diamond exports to India dated 10.6.2021 is attached as Appendix 41;

136. In fact, diamonds weighing 690.32 carats (raw) were sold in Israel in the amount of US $112,222. For this commodity, the plaintiffs paid a total of US $185,005. If the defendants had met the standard set in the contract, these diamonds would have been sold to consumers for a total price of US $345,000. The plaintiffs were thus denied a profit of US $232,778, for the diamonds received from the defendants but not sold.

137. Diamonds weighing 597.82 (raw) were sold in India for a total of US $102,221. However, if the plaintiffs had complied with the standard set in the contract, these diamonds would have been sold for US $298,910. This deprived the plaintiffs of a

profit of US $196,689.

138. In all, in this shipment, the plaintiffs were denied a profit of US $575,827.

139. **From the aforementioned it can be understood that the defendants sent the plaintiffs diamonds with a total weight of 9,876.28 carats, while the plaintiffs managed to sell only about 42% of them (4,167 carats). An amazing statistic that shows how fundamentally damaged the goods sent to the plaintiffs were.**

140. As stated, the plaintiffs' representatives had several conversations with the defendants during which the defendants acknowledged that the diamonds they supplied did not meet the standard set in the contract, and therefore undertook to replace them with those that would meet the standards set forth in the agreement. Furthermore, the defendants undertook to supply the plaintiffs with diamonds of color E-F, within a maximum of two months (a promise that was never fulfilled).

141. Despite this explicit promise, the alternative shipment was no better than the previous shipments, and the defendants remained in a fundamental breach of the agreement. This is a substantial and blatant violation of the agreement, which caused (and continues to cause) severe damages to the plaintiffs.

142. At this point in time, while the alternative shipment sent by the defendants dated 8.4.2021 was also of inferior quality that did not meet the terms of the agreement, the plaintiffs' patience ended after the defendants' false promises to improve the quality of the diamonds.

143. In light of the aforementioned, and since the substantial breach was not remedied by the defendants Despite the countless times given to them, the plaintiffs sent the defendants a letter on 30.6.2021 in which the plaintiffs announced the termination of the agreement in view of its fundamental breach, claiming compensation for damages.

144. The plaintiffs also asked the defendants to take back those diamonds sent to the plaintiffs which do not meet the standard agreed upon.

145. The plaintiffs sought to enter into negotiations with the defendants to terminate the engagement, or alternatively to activate the mediation mechanism set forth in clause

6.9 of the agreement.

A copy of the plaintiffs' letter dated 30.6.2021 is attached as <u>Appendix 42</u>;

146. On 8.7.2021 the defendants replied, through Mr. Michael Clonico, the CFO of the defendants. According to him, in the contract signed between the parties there is no obligation for a particular shade, and at the same time it was argued that the color of the diamonds in the coming monthly shipment significantly exceeds what is required in the contract, and is now given at no extra charge.

147. The defendants boasted in their letter and set a condition that if the plaintiffs does not receive the defendants' next shipment, the defendants will have no further obligation to the plaintiffs, and this will be able to retain all the payments paid to her in advance by the plaintiffs.

A copy of the defendants' letter dated 8.7.2021 is attached as <u>Appendix 43</u>;

148. On 14.7.2021 the plaintiffs replied to the defendants' letter, noting that they rejected their claims, and had in their possession clear evidence that the diamonds sent to them had adversely deviated from the standard set out in the contract. In these circumstances, the plaintiffs reiterated their demand to activate the mediation mechanism set forth in Section 6.9 of the Agreement.

A copy of the reply letter on behalf of the plaintiff dated 14.7.2021 is attached as <u>Appendix 44</u>;

149. This letter from the plaintiffs remained unanswered, and the plaintiffs was left with no choice but to file the lawsuit against the defendants, so that the Honorable Court orders the plaintiffs' compensation for loss of profits, damages caused to them, and restitution to the defendants for goods the plaintiffs never received, and for poor goods not agreed in the contract.

150. It should be noted that prior to the filing of the lawsuit, the defendants raised various claims (which have no basis in fact), and even offered to return to the plaintiffs the down payment of US $2,500,000.

## E(5). The law applied to the lawsuit

151. There is no dispute that the agreement between the parties is a standard contract as

defined in the Standard Contracts Law, 1982 (hereinafter: **the Standard Contracts Law**). That is, "a draft of a contract whose terms, in whole or in part, have been predetermined by one party to serve as terms for many contracts between it and persons not specified in their number or identity."

152. The wording of the contract between the parties was worded by the defendants, and the plaintiffs was not given any opportunity to make changes to it despite their requests to do so. It is sufficient to examine the first part of the contract, in which the date and name of the plaintiffs were filled out in handwriting, to see that it is a standard contract whose terms have been formulated in advance to be used for many engagements.

153. Section 6.6 of the agreement states that the validity of the agreement, its interpretation and enforcement are subject to the laws of the State of California:

**"Applicable Law and Compliance with Law: The validity, interpretation and enforceability of this Agreement shall be governed and construed in all respects in accordance with the laws of the State of California without regard to principles of conflict of laws. The United Nations Convention on the International Sale of Goods (CISG) does not apply to this Agreement. The parties will comply with all applicable laws under this Agreement".**

154. The plaintiffs will argue that this condition constitutes a discriminatory condition in a standard contract in accordance with section 3 of the Standard Contracts Law, which justifies its repeal, and as a direct derivative of the application of Israeli law to the agreement and the claim.

155. In the Civil Appeal Authority 5860/16 **Facebook Inc. v. Ohad Ben Hamo** (Nevo, 31.5.2018) (hereinafter: **Ben Hamo case**), the Supreme Court ruled that a choice of law clause that applies the laws of the State of California does not constitute a discriminatory condition in a standard contract.

156. However, the claim is distinguished from Ben Hamo case, since in our case the defendants seek to deprive the plaintiffs of subsistence compensation. In doing so, the defendants deny the plaintiffs grounds for law which constitutes a discriminatory

condition in a standard contract.

157. The claim is also distinguished from Ben Hamo case, since the condition of jurisdiction is worded in such a way that it applies California law **only** in relation to the validity of the agreement, its interpretation and enforcement. Since this claim is not relevant in examining the validity of the agreement, its interpretation or enforcement, the law of the State of California does not apply in this case, and the applicable law is Israeli law.

158. Civil Appeal Authority 8160/20 **Google LLC. (Formerly Google Inc.) v. Doron Eshel** (Nevo, 20.2.2022) (hereinafter: **the Google case**), the Supreme Court ruled that in cases where the stipulation of choice of law is vaguely worded, the interpretation against the drafter of the agreement should be preferred and Israeli law should be applied to the claim:

> **"The condition of choice in this case is vaguely worded, in the negative, so that it focuses on the 'exceptional' case ('in cases where California state laws do not apply') and does not unequivocally clarify what is the legal rule to be applied. In this situation, the Terms of Service Agreement must be interpreted against Google's interest, given the fact that Google is the party that drafted the agreement (section 25 (b1) of the Contracts Law, Facebook case, paragraph 20). Accordingly, the interpretation that Israeli law applies in the event of a dispute between the user and Google must be preferred, which means that Israeli law applies to applications for approval"** (paragraph 14 of the decision).

159. In these circumstances, where the contract is drafted by the defendants, and they are the ones who chose to formulate it in a way that applies California law to certain cases only, then the application of Israeli law over foreign law should be preferred, as the Supreme Court ruled in the **Google case**.

160. Accordingly, the plaintiffs will petition for remedies under Israeli law.

161. Alternatively, and for the sake of caution, the plaintiffs will petition for remedies

under the law applicable in the State of California, in accordance with an expert opinion approving the foreign law and its interpretation.

162. It will be clarified for the avoidance of doubt that the plaintiffs does not claim the parallel application of two systems of law - Israeli law and California law - but claims that the applicable law is Israeli law, and alternatively, only California law applies. This alternative claim for remedies under foreign law is made in accordance with the ruling of the Honorable Justice Ruth Ronen in Tel Aviv (Economic) 23821-02-17 **Yoram Hayut v. Kobi Koren** (Nevo 19.12.2017).

## E(6). Causes of action

163. Based on what is stated in this statement of claim, the plaintiffs have causes of action against the defendants, inter alia, by virtue of the law of contracts, law of torts, unjust enrichment law and as detailed below:

    A. The plaintiffs will argue that the defendants did not comply with the agreement to which they undertook, and provided the plaintiffs with poor quality diamonds from the contractual standard agreed upon, which constitutes a breach of contract as defined in the Contracts Law (Remedy for Breach of Contract), 1970;

    B. The defendants' refusal to reimburse the plaintiffs for the US $2,500,000 delivery fee paid in advance, even though the goods were not actually delivered and even though their representatives admitted that the goods were supplied to the plaintiffs was defective, constitutes unacceptable conduct and bad faith in performing a contract as defined in the Contracts Law. (General Part), 1973;

    C. The plaintiffs will argue that it agreed to sign a long-term agreement only because of the defendants' promises that the diamonds supplied to them will be of a quality that does not fall short of, or even exceed, the shipments of diamonds supplied to them during the two years prior to signing the agreement. The defendants admitted to a defect in the diamond production, but did not disclose it to the plaintiffs prior to signing the agreement. In doing so, the defendants misled the plaintiffs into thinking that they would be provided with high-quality diamonds, as defined in section 15 of the Contracts Law (General Part), 1973;

    D. As described above, when the plaintiffs signed the agreement, it relied on the quality of the diamonds agreed upon in the contract, and on the basis of the early shipments

(prior to signing the agreement). Therefore, the plaintiffs erroneously relied on the fact that the defendants would honor its obligation under the agreement and provide the plaintiffs with diamonds of the required quality.

E. Had it not been for this error, the plaintiffs would not have entered into an agreement with the defendants in the agreement and transferred a down payment of US $2,500,000. Therefore, in accordance with sections 14 and 19 of the Contracts Law (General Part), 5733-1973, the plaintiffs demand cancellation and restitution;

F. The plaintiffs will claim that the contract that the plaintiffs was required to sign is a discriminatory standard contract, as defined in this term in the Standard Contracts Law, 1982;

G. The plaintiffs will claim that in doing the actions described in the claim, the defendants acted while making unjust enrichment as defined by this term in the Unjust Enrichment Law, 1979, and all on the plaintiffs' back and with a clear (and wrong) intention to mislead the plaintiffs in relation to the quality of the diamonds sent to the plaintiffs as part of the agreement, so that the defendants can increase (illegally) the profit that will go into their pocket;

H. The plaintiffs will argue that in doing the actions described in the claim the defendants acted fraudulently and at least negligently as defined by these terms in sections 56 and 35 of the Torts Ordinance [new version];

I. As detailed in the statement of claim, the defendants did not meet the contractual standard agreed between the parties, and provided the plaintiffs with low quality diamonds. Therefore, the plaintiffs will argue for a non-conformity in the sale as the definition of this term in sections 11 and 27 of the Sale Law, 1968.

## E(7). Alternatively - the causes of action in accordance with the law applicable in the State of California

164. Alternatively, and for the sake of caution, the plaintiffs will argue that they have grounds for a claim against the defendants, also in accordance with the law applicable in the State of California, and all in accordance with what is stated in Dr. Karni Shagel-Peppcorn's opinion attached as Appendix 45.

165. According to the opinion, in the factual circumstances described above, the plaintiffs is entitled, by virtue of the laws of the State of California, to a series of remedies for

breach of contract and breach of Warranties by the defendants.

166. These remedies include restitution compensation and even subsistence compensation of various types. This is because the plaintiffs lawfully rejected the portion of the goods supplied to them by the defendants and because the other portion of the goods did not meet the express representations presented to the plaintiffs by the defendants.

167. In addition, in the circumstances of the case it appears that the plaintiffs will be able to substantiate, under California law, a tort claim of fraud by making a false promise.

168. **Breach of contract and rejection of goods in accordance with UCC and CAL. COM. CODE** - U.S. contract law is grouped at the federal level by the Uniform Commercial Code (hereinafter **the UCC**). The UCC is a collection of laws that deal with commercial transactions, which all the various U.S. states have adopted in their state legislation. In California, the UCC provisions are incorporated within the California Commercial Code (hereinafter: **Cal. UCC**).

169. Unlike general contract law, sales contracts according to the Cal. UCC is not based on the distinction between a fundamental breach and a non-fundamental breach, but on the principle of perfect tender, according to which any non-compliance of the goods with the terms of the contract, mild or severe, establishes the buyer's right to reject the goods in full.

170. However, in accordance with section 2612 of Cal. UCC, in the case of a contract made through periodic shipments, in the case of a shipment or shipments that do not meet the terms of the contract, and which do not amount to a material breach of the value of the contract as a whole, the seller is entitled to repair the defect through future shipments. In cases of non-conformity of the shipment in which the seller provides an adequate promise to repair the defect later - the buyer is obliged to accept the shipment. As the case law points out, this exception is intended to prevent the cancellation of contracts performed over a long period of time (see for example: Kca Electronics, Plaintiffs And Appellant v. Legacy Electronics, Defendants And Respondent, 2007 Cal. App. Unpub. LEXIS 6107).

171. According to section 2608(1)(a), if a buyer has received a commodity based on the seller's promise to rectify its non-conformity but the defect has not been rectified, the

buyer is entitled to **retroactively** reject the commodity. If he did so, the buyer who retroactively rejects a commodity would have been granted all the rights he would have had if he had rejected the commodity in the first place.

172. Under section 2608(2), the right to retroactively reject received goods remains with the buyer as long as he has notified the non-conformity within a reasonable period of time after he has learned or had to learn about the non-conformity and before any change is made in the goods which is not due to the non-conformity. According to Section 2602, upon notice of deferral the buyer must refrain from operations involving an act of ownership of the goods, and must maintain it reasonably for a period of time which will enable the seller to take them. In doing so, the buyer goes through the motions after the notice of rejection: "the buyer has no further obligations with regard to goods rightfully rejected".

173. In our case, the plaintiffs lawfully, under California law, made a retrospective deferral of the goods that did not comply with what was stated in the contract, and therefore they have all the remedies available to the law for deferring unsuitable goods.

174. In more detail, the plaintiffs notified the defendants of the nonconformity as soon as the nonconformity became known to them. This, immediately after the processes of polishing and improving the color, to which the diamonds were handed over, were given a rating for their quality, a stage after which only the plaintiffs could learn about the existence of a discrepancy.

175. With the plaintiffs' notice to the defendants about the non-compliance of the first shipment from October 2020, the latter acknowledged the problem and assured the former that this would be rectified in the next shipment. According to section 2612 of the Law and as aforesaid, since the defendants recognized the non-conformity of the shipments and undertook to rectify the non-conformity through future shipments, the plaintiffs was obliged to rely on this undertaking and accept the shipments received from them in anticipation of repair through future shipments.

176. As required by law, the plaintiffs have given the defendants an opportunity to repair the defect over a number of shipments, based on repeated assurances that the problem is known, will be addressed and corrected. However, in June 2020, the plaintiffs faced a situation in which eight shipments that did not comply with the agreement were

received, including an alternative shipment whose entire purpose was to replace the defective goods (with other defective goods).

177. In these circumstances, since the diamonds supplied were of poorer quality than agreed in the contract, and the defendants did not keep their promise to correct this defect, the plaintiffs had the right to receive the goods in full despite the non-conformity, to reject it in full, or to accept part and defer the rest. In a letter to the defendants dated 30.6.21, the plaintiffs stated that she considers the goods received to be goods that do not conform to what is agreed in the contract and that the plaintiffs are interested in returning. In doing so, the plaintiffs discharged their obligations under sections 2602 and 2612 of the UCC and the Cal.UCC and made a lawful rejection of the goods supplied to them.

178. However, the defendants refrained from collecting the diamonds and left them all in the hands of the plaintiffs. In order to reduce damages, the defendants were able to sell some of the defective goods whose defect was less severe, namely the diamonds which were closer to meeting the terms of the contract in terms of the quality of the diamonds supplied. These diamonds were sold by the plaintiffs so that they can be seen as received diamonds. The plaintiffs lawfully rejected the other part of the diamonds, without any change being made beyond the polishing and refining procedures required to detect the discrepancy.

179. According to section 2612 (3) of the Cal.UCC, where a non-conformity with respect to one shipment or multiple shipments amounts to a breach of the value of the contract as a whole it amounts to a breach of the entire shipment contract. Accordingly, since all of the shipments delivered to the plaintiffs were of poor quality, they had the right to cancel the contract in its entirety and demand the remedies available to her under California contract law.

180. Breach of Warranties - Parallel to the general issue of breach of contract, the Cal. UCC discusses breach of contract terms that constitute a Warranty regarding the quality and characteristics of the goods. Under section 2313(1)(a) of Cal. UCC, any description of the goods which formed the basis of the sale transaction constitutes the express warranty of the seller that all goods will conform to this description. Section 2313(2) adds that in order to create an express warranty there is no need to use official

terms such as warranty or guarantee.

181. In order to understand the exemption clause contained in the contract, it should be noted in parenthesis that **beyond** the express warranty, the Cal. UCC adds two types of implicit warranty, which may exist in disconnection in addition to express warranty. Thus, section 2314 discusses the possibility of the existence of an Implicit warranty of merchantability, according to which in every contract of sale a promise can be made conditional on the goods meeting the minimum conditions accepted in the market.

182. In addition, section 2315 discusses the existence of an Implicit warranty of fit for particular purpose. According to this section, where the seller must know of the existence of an individual purpose that the goods are intended to fulfill and the buyer relies on the seller's skill and discretion that the supplied goods will fulfill this purpose, there is an implied promise that the goods will be suitable for the existence of that purpose.

183. Under section 2316(1) of Cal. UCC, as long as the contract contains both terms that create an express warranty and terms that are intended to limit the seller's obligation, these terms will be interpreted, as far as possible, in a way that does not lead to a conflict between them. However, as long as there is no interpretation that satisfies both conditions, the condition establishing the express warranty will increase.

184. Separately from this provision, section 2316(2) adds a parallel provision with respect to implicit warranties, according to which a stipulation in a contract intended to limit the implicit warranties is obligated to meet certain conditions relating to the explicitness of the stipulation. Section 2316(3) adds and lists situations that indicate the nullity of implicit warranties, such as the use of the terms "as is".

185. The first note in the explanatory notes attached to the section clarifies both the clear intention of the legislature to protect the buyer from exemption clauses seeking to void explicit assurances regarding the quality of the goods, and the distinction between express warranties immune from these clauses, and implicit warranties, which are subject to certain conditions.

186. This immunity of express warranties against their revocation by exemption clauses

was recognized by the ruling of the California Supreme Court in the Hauter v. Case. Zogarts, 14 Cal. 3d 104, which stood on the unequivocal intention of the legislature and determined accordingly that a limitation of express warranty would not be possible without, at the very least, words clearly expressing that any particular risk falls on the shoulders of the buyer. Accordingly, the court held that in any case of doubt as to the interpretation of the contract in this matter the condition of the exemption would be construed narrowly **and against the seller** (Hauter v. Zogarts, 14 Cal. 3d 104, 119).

187. In light of these arrangements, it is clear that the stipulation of the exemption in the contract cannot be understood as intended to limit the implicit warranties arising from the contract, nor the express warranty under which the goods meet the conditions listed in the appendices. This interpretation of the contract is learned both from the use of the clause in terms relating to the law to limit implicit warranties, and from the provision that, as far as possible, a condition creating warranty and a restrictive condition shall be construed in a manner that does not contradict them, and also from the rule of law that exemption clauses shall be construed narrowly against the seller. Moreover, even if the section intended to limit the express warranty, it does not have the power to do so since it does not meet the minimum conditions set out in the ruling, according to which, at the very least, any restriction must explicitly state the risks borne by the buyer due to the warranty limitation.

188. According to Section 2714(2) of Cal. UCC, even when the buyer has received the goods, breaches of warranty give the buyer a cause of action for non-compliance with the promise.

189. In the circumstances described, in relation to the share of the diamonds that were not rejected by the plaintiffs, namely the diamonds sold by them, they have the right to be compensated for the breach of the promise regarding their quality.

190. **False promise** - In addition to dealing with a contract entered into between the plaintiffs and the defendants and in breach of it, the stage prior to the conclusion of the contract must also be considered. As stated above, the conclusion of the contract that is the subject of this proceeding was made following a previous relationship of one-time transactions between the parties, and further on the condition that the

defendants set before the plaintiffs that they continue to provide diamonds only if the latter agrees to a five-year long-term agreement. (As well as a false promise to supply the plaintiffs with a grade E-F diamonds).

191. The plaintiffs agreed to this demand in light of the plaintiffs' promises that the diamonds supplied to them will be of a level of quality that does not fall short of, and even exceed, the shipments of diamonds supplied to them during the last two years. However, when less quality diamonds were received and the defendants was confronted with this fact, the defendants admitted that moving to a date when the defendants required the plaintiffs to sign a long-term agreement, the defendants replaced equipment for diamond production and that this was the reason for their low quality.

192. Under California law and further aforesaid, the plaintiffs may establish a cause of action for "Promissory Fraud," a false promise that caused the plaintiffs to enter into a long-term agreement resulting in damages (Lazar v. Superior Court, 12 Cal. 4th at 645). Section 1709 of the California Civil Code states that anyone who frauds someone else with the intent to cause him to change his condition is liable for damages caused to him as a result.

193. According to the ruling, the components of the tort of fraud are (a) misrepresentation; (B) awareness of the untruth of the presentation; (C) intent to deceive, i.e., to create reliance on the presentation; (D) reasonable reliance; And (E) damage caused as a result. (Beckwith v. Dahl (2012) 205 Cal.App.4th 1039, 1059–106. Section 1710 (4) of the California Civil Code interprets the meaning of fraud as including, but not limited to, "Promissory Fraud" given without intent to sustain.

194. In the circumstances of the case, it appears that the elements of the tort of fraud were met. The defendants assured the plaintiffs that the quality of the diamonds supplied to them would be at least as high as before. As for the defendants' intention at the time of the promise, the circumstances in which the defendants planned to completely replace the equipment used to produce the diamonds with new equipment whose performance is not yet known, the defendants knew at the time of making the promise that they were not at all sure they could keep it.

195. Moreover, the proximity of the times between the replacement of the equipment and

the pressure exerted by the defendants on the plaintiffs to enter into a long-term agreement and their refusal to continue in a situation where the plaintiffs can stop contacting the defendants immediately as soon as the goods received are not to their liking - support the conclusion that the defendants suspected that they would not be able to supply diamonds of the same quality - thereby fulfilling the requirement for reasonable "knowledge and belief" of the plaintiffs, because the defendants did not intend to keep their promise.

## H(8). The remedies sought

196. Based on the factual tract detailed above, the plaintiffs demand from the defendants a total payment of NIS **23,822,116** plus linkage and lawful interest.

197. The plaintiffs will demand the refund of the down payment (supply commission) paid to the defendants as well as compensation for the loss of their profits, as detailed below:

   A. Reimbursement of the down payment paid to the defendant in the amount of US $2,500,000, less the sum of US $296,849 for the diamonds sold, less a total of US $95,052.9, which is NIS 321,659 and a total of US $2,108,098, which is **NIS 7,133,804** (at a dollar exchange rate of NIS 3.3840 at the time of signing the agreement);

   B. Payment of subsistence compensation for the shipments that were provided to the plaintiffs and did not meet the contractual standard, in the amount of US $2,614,709, which is **NIS 8,445,510** as of the date of filing the claim:

      (1) For the diamonds sold by the plaintiffs, the plaintiffs will demand to receive the difference between the price at which the diamonds were actually sold and the price of the diamonds if the defendants had supplied the diamonds to the plaintiffs in accordance with the contractual standard. The plaintiffs will demand for this component a total of US $905,214, which is **NIS 2,923,841**;

      (2) For the diamonds not sold by the plaintiffs, the plaintiffs will demand to receive the US $1,709,495, which is **NIS 5,521,668**.

   C. Payment of subsistence compensation for 53 shipments that **were not** provided to the plaintiffs up to the date of filing the claim (March 2022), for which the plaintiffs was

denied an expected profit of **NIS 8,000,000**;

D. The plaintiff wills demand compensation for damage to reputation and mental anguish caused to them by the defendants in the amount of NIS 500,000, and this by way of underestimation;

E. Out of the total, the plaintiffs' total sales must be deducted as part of the sixth shipment, given to the plaintiffs free of charge, in the amount of US $116,051, which is NIS 376,005.

**In total, the plaintiffs will demand from the defendants a total of NIS 23,703,309.**

198. **Alternatively only**, the plaintiffs will demand cancellation and restitution in the amount of **NIS 12,989,800**, as detailed below:

A. Reimbursement of the delivery fee paid to the defendants in the amount of US $2,500,000, which is NIS 8,460,000 at the time of signing the agreement, after deducting the refund given to diamonds sold at a value of US $149,033, which is NIS 504,327, and after deducting a total of US $95,052.9, And a total of US $2,255,914, which is **NIS 7,286,603** (at a dollar exchange rate of NIS 3.3840 at the time of signing the agreement);

B. Return on total diamond purchases not sold from the date of signing the agreement, for a total of US $638,953, which is **NIS 2,063,818**.

C. The plaintiffs will further demand the payment in respect of the wages required to be invested in the diamonds received from them. The plaintiffs will demand for this component a total of US $878,850 which is **NIS 2,847,474**.

D. The plaintiffs will demand compensation for damage to reputation and mental anguish caused to them by the defendants in the amount of NIS 500,000, and this by way of underestimation;

E. Out of the total, the plaintiffs' total sales as part of the sixth shipment, given to the plaintiffs free of charge, should be deducted in the amount of US $116,051, which is NIS 377,165.

**In total, the plaintiffs will demand a total of NIS 12,989,800 from the defendants.**

199. Alternatively only, the plaintiffs' petitions for remedies against the defendants, in accordance with the law applicable in the State of California, as set forth in Dr. Karni's opinion, as follows:

A) **Cancellation and Reimbursement of the Down payment** - Reimbursement of

the down payment paid to the defendant in the amount of US $2,500,000, after deducting a total of US $296,849 for the diamonds sold, and a total of US $2,203,151, which is **NIS 7,455,462** (at a dollar exchange rate of NIS 3.3840 at the time of signing the agreement);

B) **Reimbursement of the amounts paid for the rejected diamonds** - According to Article 2711 of the Cal.UCC., A buyer who has lawfully rejected the goods is entitled to a refund of the amounts paid for them. In these circumstances, the plaintiffs are entitled to a refund of the money they paid for the diamonds they lawfully rejected (those with the lower carat quality among the diamonds supplied, which were not sold), which according to the calculations amount to US $638,953, which is **NIS 2,063,818**;

C) **Compensation for an alternative market value in respect of rejected diamonds** - the goods rejected by the plaintiffs included diamonds in the amount of 4,137.94 carats, which according to the contract were priced at $145 per carat, at a total contract price of US $600,001.3. At the time of receipt of the goods, the market price of alternative diamonds of the guaranteed quality in Israel was US $240 per carat, with a total value of US $993,105.6. Accordingly, the compensation to which the plaintiffs is entitled for section 2713 in respect of the rejected diamonds stands at the difference between the two, namely, US $393,104, which is **NIS 1,269,727**;

D) Alternatively, compensation for the non-conformity of the rejected diamonds. As stated above, 4,137.94 carats of the diamonds were lawfully rejected by the plaintiffs, entitling them to remedies under sections 2711 and 2713. However, to the extent that it is determined that these diamonds were not lawfully rejected but were accepted by the plaintiffs, then in this case they are entitled to a remedy under section 2714 in relation to these diamonds. The estimated average value of these diamonds is US $75 per carat. Accordingly, the alternative compensation for these diamonds will be US $682,760, for the difference between the guaranteed value and the actual value, which is NIS 2,205,315.

E) **Compensation for non-compliance of the diamonds that were not rejected to the terms of the contract** - according to section 2714, the amount of compensation for the breach of the express warranty regarding the quality of the diamonds is the difference between the equivalents of the promised diamonds, that is, $240 per carat and the market value of the diamonds actually received,

estimated at an average of US $150 per carat, relative to 4,516.19 carats, for a total of US $406,453, which is **NIS 1,312,856**;

F) **Ancillary and consequential compensation** - In addition to restitution, coverage, and compensation for breach of warranty, section 2715 gives the affected party the right to compensation for ancillary and consequential damages. Under section 2715(1), ancillary damages are those incurred as a result of the breach, and include expenses for the examination, receipt, transport, handling, and possession of the lawfully rejected goods, as well as expenses relating to the purchase of alternative goods and other ancillary expenses. The plaintiffs will demand payment for the wages required to be invested in the diamonds received from them, in the amount of US $878,850 which is **NIS 2,847,474**.

**In total, the plaintiffs will demand from the defendants a total of NIS 14,949,337.**

## F. Conclusion

200. In view of the above, the Honorable Court is requested to accept the claim and to charge the defendants with the remedies sought above, plus the linkage differences and lawful interest from the date of filing the original claim until the actual payment.

201. In addition, the Honorable Court is requested to charge the defendants with the plaintiffs' expenses, including attorney's fees in addition to lawful VAT. It is hereby clarified that nothing alleged in this statement of claim will not shift the burden of proof imposed on the defendants by law.

_____          _____

Avichai Yehosef, Adv.                    Amit Hadad, Adv.

Case 3:24-cv-03836 Document 158 Filed 06/26/25 Page 51 of 72

**EXHIBIT 2**

**In the District Court**                                           **Civil Case 57904-03-22**
**in Tel Aviv**
**Regarding:**

                **1. E.Y Orot Assets Ltd, 515082220**
                **2. Omega Eco Diamonds Ltd, 516219675**

                By attorneys Amit Haddad (L.N 62884) and/or Avihai Yehosef (L.N 80799)
                From the of Haddad, Roth, Shenhar & Co. office
                From 2 Weizman St. (Amot Investments), 22nd floor, Tel Aviv
                Tel: 03-5333313; Fax: 03-7181112
                Email: office@har.law
                                      **the plaintiffs** (the applicants);

                            - Vs. -

                Diamond Foundry Inc
                Company ID Number 0001853958
                322 East Grand Avenue
                South San Francisco, CA 94080
                Phone: (415) 636-5222
                Email: martin@diamondfoundry.com
                                  **the defendant** (the respondent);

### A request for a judgment in the absence of a defense

The Honorable Court is requested to use its authority according to Rule 130 of the Rules of Civil Procedure, 2018 and give a verdict against the defendant based on the statement of claim due to the failure to submit a statement of defense on their behalf.
Attached to this request is a version of a judgment for the review and signature of the honorable court.

### And these are the reasons for the request:

1. On March 27, 2022, the claim in the title was submitted to the honorable court.

2. On April 7, 2022, the request was submitted to determine the method of issuing outside the country.

3. In the application, it was explained in detail that the defendant is an established company in the state of California and has an official address - South San Francisco, CA 94080 Grand Avenue 322 East

4. This address is indicated in official documents, thus a document sent by the defendant to the Securities and Exchange Commission of the United States, as part of a notice on an exempt issuance of securities, its address was given above.

A copy of the defendant's notice to the Securities and Exchange Commission of the United States of America as Appendix 1;

5. Furthermore, as detailed in the statement of claim, the plaintiffs sent a letter on their behalf before filing the claim to the defendant via an international shipping company - DHL - to the

above address (Appendix 43 to the statement of claim), while the defendant's representative signed the receipt of the letter.

A copy of the delivery of the letter on behalf of the plaintiffs (Appendix 43 to the statement of claim) to the defendant as Appendix 2;

6. The defendant received the plaintiffs' letter, and a reply on their behalf was sent to the plaintiff via email (Appendix 44 to the statement of claim), when close to the submission of the claim in the title, negotiations took place (which failed) between the parties (see section 150 of the statement of claim). Therefore, there is no doubt that the place of residence of the defendants, the method of issuing to them and the ability to speak with them - are well known to the plaintiffs and the undersigned.

7. On April 10, 2077, the honorable court ordered as follows:

> **"After one party reviewed the claim, in accordance with the provisions of Rule 166-167 of the Civil Procedure Regulations 2018 (hereinafter: "Civil Procedure Regulations") it was determined as follows:**
>
> **1. The pleadings, the invitation to the hearing, the request regarding the out-of-country issuing, this decision and the provisions of sections 166-169 of the civil procedure regulations, will be delivered by the applicants to the respondents within 90 days from today. The delivery confirmations will be submitted to the court file.**
>
> **2. The issuance will be made, as requested, by courier or by registered mail. All with delivery confirmations. Regarding the language of the translation - the documents will be translated in accordance with the 1965 Hague Convention, volume 23, page 31.**
>
> **3. The respondents will file a statement of defense within 60 days from the date of delivery of the documents to them.**
>
> **4. It is brought to the attention of the respondents that they can override the authority of the court to hear the claim, and this in accordance with the provisions of sections 168-169 of the civil procedure regulations.**

8. On May 12, 2027, the defendants were served with the statement of claim, the request to determine the method of carrying out the out-of-the-country issuing, the invitation to a hearing, the decision of April 10, 2022 and the provisions of sections 169-166 of the Civil Procedure Regulations 2018, when they are translated into the English language.

A copy of the translator's affidavit on the translation of the aforementioned documents into the English language is attached as Appendix 3;

9. The issuance was made by the shipping company DHL and the delivery confirmation was signed by an employee of the defendant who identified himself as IVAN GRI.

A copy of the delivery confirmation signed by Mr. IVAN GRI is attached as Appendix 4;

A reference on the status of the shipment until it is delivered to the defendant is attached as Appendix 5;

A receipt for the shipment made to the defendant is attached as Appendix 6;

10. However, even though the deadline for submitting a statement of defense passed on July 17, 2022, the defendants did not submit a statement of defense or a request for apostasy under the authority of the honorable court.

11. It should be noted that the statement of claim and its appendices illustrate how strong and probable the claim against the defendant is. An agreement was signed between the defendant and the plaintiffs when the defendant did not comply with the agreement to which they committed, and provided the plaintiffs with diamonds of inferior quality to the contractual standard agreed upon, which constitutes a breach of contract.

12. The defendant's refusal to return to the plaintiff the supply fee paid in advance in the amount of $2,500,000 US dollars, even though **the goods were not actually delivered** and even though its representatives admitted that the few goods that were delivered to the plaintiff were defective, constitutes an unacceptable behavior and in bad faith in maintaining a contract.

13. **This is enough to establish a proper cause of action, since there is no dispute that the defendant has in their hands a huge sum of $2,500,000 US dollars, and this without having provided the plaintiffs with the goods they paid for with their hard earned money.**

14. Therefore, the honorable court is requested to issue a judgment in the absence of a defense, as requested.


עמית חדד, עו"ד

Amit Hadad, Attorney

אביחי יהוסף, עו"ד

Avihai Yehosef, Attorney

**on behalf of the plaintiffs**

**In the District Court**                                        Tel-Aviv 57904-03-22
**in Tel Aviv**
**Regarding:**

> 1. A.I Orot properties Ltd, 515082220
> 2. Omega Eco Diamonds Ltd, 516219675
> By attorneys Amit Haddad (L.N 62884) and/or Avihai Yehosef (L.N 80799)
> From the office of Haddad, Roth, Shenhar & Co.
> From 2 Weizman St. (Amot Investments), 22nd floor, Tel Aviv
> Tel: 03-5333313; Fax: 03-7181112
> Email: office@har.law

**the plaintiff**s (the applicants);

- Versus -

> **Diamond Foundry Inc**
> Company ID number 0001853958
> 322 East Grand Avenue
> South San Francisco, CA 94080
> Phone: (415) 636-5222
> Email: martin@diamondfoundry.com

**the defendant** (the respondent);

# Verdict

After the defendant did not file a statement of defense on time, a verdict was given according to the statement of claim as follows:

1. The defendant will pay the plaintiffs the amount of the claim in the amount of NIS 15,000,000 (fifteen million NIS). This amount will bear linkage differences and interest as per the law from the day the claim is filed until the actual payment.

2. Also, the defendant will pay the plaintiffs the court costs (the court fee in the amount of NIS 187,500). This amount will bear linkage differences and interest from the day the claim is filed until the actual payment.

3. In addition, the defendant will pay the plaintiffs their lawyers' fees in the amount of NIS 100,000. This amount will bear linkage differences and interest from the day the claim is filed until the actual payment.

_____                        Date _____

Judge



The District Court in Tel Aviv – Jaffa

Civil case 57904-03-22 E.Y. Orot Assets Ltd. And others Vs. DIAMOND POUNDRY LNC

Before the Honorable Judge Yaakov Shaked

Copy of the court decision of August 14, 2022

After reviewing the claim and the expiration of the deadline for filing a statement of defense, a judgement as requested. The judgement is approved.



Tel Aviv District Court
certified copy

<span style="color:red">**** In any case, the binding wording is the one in the decision signed by the judge</span>

**EXHIBIT 3**



The District Court in Tel Aviv-Jaffa

**Civil case 57904-03-22 E.Y Orot Assets LTD and others vs. DIAMOND FOUNDRY INC**

Before  Honorable Judge Yaakov Shaked

| | |
|---|---|
| Plaintiffs | 1. E.Y Orot Assets LTD |
| | 2. Omega Eco Diamonds Ltd |
| | By Attorney Avichai Yehosef and others |
| | |
| | Vs. |
| | |
| Defendant | DIAMOND FOUNDRY INC. |
| | By Attorney Yehoshua Lieberman and others |

<u>**Decision**</u>

Request to cancel a judgment dated 14.8.22 given in the absence of a defense.

<u>**Background and claims of the parties**</u>

1. dealing with a lawsuit for NIS 15 million. In summary, the lawsuit claims that the plaintiffs and the defendant entered into an agreement dated 14.10.20 according to which the defendant will supply the plaintiffs with diamonds for several years, under the conditions set forth therein, where 33 dollars will be added to each carat supplied, as a supply fee, for the right to purchase the diamonds at the price fixed in the agreement and when the plaintiffs will pay the defendant at the expense of the said supply fee 2.5 million dollars (Appendix 11 to the lawsuit; hereinafter - the agreement). The amount of the advance was paid to the defendant back in 2010, as shown in Appendix 13 to the lawsuit.

2. Before signing the agreement, the defendant provided the plaintiffs with diamonds on several occasions. According to the plaintiffs, after the signing of the agreement, several shipments of diamonds were made, for which they paid considerable sums, and it became clear to them that the quality of the diamonds provided within the framework of the agreement falls significantly below the detailed standard stipulated in it, as well as in relation to the diamonds provided before its signing. Therefore, the plaintiffs are petitioning for the return of the said advance as well as for the payment of additional amounts, including subsistence allowances.

3. After an out-of-bounds invention was made with the approval of the court, a judgment was given in the absence of defense.



The District Court in Tel Aviv-Jaffa

**Civil case 57904-03-22 E.Y Orot Assets LTD and others vs. DIAMOND FOUNDRY INC**

4. On October 6, 2022, the defendant submitted a request to cancel the verdict. The application claims, among other things, that the defendant, a foreign company, received the statement of claim translated into English and sent the court's secretary on 6.6.22 via the shipping company "Fedex" a statement of defense in English and also sent a statement of defense in Hebrew by fax (appendices 1-4 to the request).

The plaintiffs did not receive any response from the court secretariat and believed that the statement of defense sent by FedEx had been received. On September 2, 2022, the defendant received the verdict on a note and believed that it was a request for a verdict. When they contacted their attorney's office, they were informed that it was a judgment and therefore the request was submitted.

The defendant claims that there was a defect in the verdict and therefore it should be annulled from the duty of justice. Unfortunately, the defendant claims that it should be canceled for reasons of discretion, since the statement of defense (which was not included in the case) presents strong defense claims, including the claim that the lawsuit was filed contrary to the provisions of the agreement that stipulate the obligation to mediate in a certain institution before filing a lawsuit, that some of the remedies are contrary to the provisions of the agreement, and that the claims regarding a defect in the diamonds baseless.

5. The plaintiffs submitted an answer to the request in which they claimed, among other things, that there was no flaw in the procedure and that the document attached as documentation for the shipment by "Fedex" includes an indication of shipment only and not of delivery. The confirmation of the fax is dated September 3, 2023, the day after the judgment was handed down to the defendant. This is contempt of court and not a technical error.

It was also claimed that the statement of defense that the defendant attempted to submit did not comply with the provisions of the Civil Procedure Regulations, 2018 (hereinafter - the regulations). The plaintiffs added that the annulment request was not accompanied by a legal affidavit since the attached document is not verified by any party. Furthermore, the attached document refers only for the claims regarding the delivery of the defense letter to the secretariat and not for the defense claims. Therefore, and in the absence of substantiation for the defense claims, the request must be rejected.

6. After submitting the answer, the parties turned to mediation. If this did not occur to them, and in accordance with the deliberative settlement of July 10, 2023, a response to the answer was submitted. As part of it, the defendant repeated the claims that there was a flaw in the procedure, and added that the claim should be dismissed due to an improper forum, including because, according to them, the agreement states that the law of the state of California in the USA will apply to the dispute.



The District Court in Tel Aviv-Jaffa

**Civil case 57904-03-22 E.Y Orot Assets LTD and others vs. DIAMOND FOUNDRY INC**

As part of the response, the defendant raised a number of claims to the substance of the matter, which mainly center on the fact that the diamonds are of the required quality and that the manner in which the plaintiffs treated the diamonds caused their color to change.

7. The plaintiff petitioned for the deletion of the affidavit attached to this response since it is not legally verified, by a local consul or notary, but by a lawyer from Spain. As part of an answer to this request, the defendant attached an affidavit verified through a consul and stated that it is only submitted at this stage due to the queue at the consulate.

8. On 10.1.24 a discussion was held, in which I was unable to bring the parties to an agreement. In this hearing and in another hearing dated January 18, 2024, the parties added various claims.

**Discussion and decision**

9. First to the question of whether there was a flaw in the procedure that warrants cancellation for the sake of justice.

The plaintiffs are right in claiming that the document in Appendix 1 to the request is only a delivery confirmation **and does not contain an indication of the delivery of the defense to the secretariat**. Even the defendant's attorney admitted this in the hearing of January 10, 2024 (p. 1 of the protocol 14-15.)

The confirmation of the fax referring to an additional defense letter, Appendix 2 to the request, **is dated 9/3/22**, more than two weeks after the judgment was rendered and one day after it was served on the defendant, and in any case, it does not help the defendant.

10. Therefore, my conclusion is that there was no flaw in the verdict. It was expected of the defendant that they would make sure that the defense was received at the secretariat and not wait for three months without doing anything. It is therefore necessary to examine whether it is appropriate to cancel the judgment due to discretion.

11. In this regard, the applicant's default and, more importantly, the chances of the defense must be examined (Civil Appeal 8292/00 Yosef v. Levinson) (27.2.01) Civil Appeals Authority 526/11 Bashara Haj v. Zidan (21.7.11)

12. It can be said that the defendant made light of the procedure and even disregarded it. As mentioned, a party is expected to make sure that the statement of defense he sent was indeed accepted by the court and not to sit idly by for three months.

Furthermore, a review of the defense letter, Appendix 3 to the request, which was sent first, reveals that it was prepared not in accordance with the provisions of the regulations and was written in the



The District Court in Tel Aviv-Jaffa

**Civil case 57904-03-22 E.Y Orot Assets LTD and others vs. DIAMOND FOUNDRY INC**

English language, apparently without receiving legal advice. But this can be seen as a certain disdain for the procedure and I will mention that this is a claim for a considerable amount. However, it cannot be said that the conduct of the defendant shows a blatant disregard for the legal process.

13. The main problem with the application concerns the chances of the defense. It is true that the claims must be supported by an affidavit, but the document attached to it is not verified at all and therefore does not constitute a legal affidavit.

Worse than that, the same document does not mention the chances of protection for the substance of the matter, that is, a reference to the quality of the diamonds. Indeed, the statement of defense that the defendant tried to submit was attached to the request, but as stated, this was not supported by the affidavit. Only in the affidavit (duly verified) that the defendant submitted to the case on 9/24/23, **about two weeks after the submission of the response to the answer and in response to the request to delete the affidavit attached to the response**, did the defendant interpret the defense's claims as true. The document attached to the response bearing the title "Affidavit" (in English) was verified as stated by a lawyer from Spain and not by a local consul or notary, as required by regulation 6 of the regulations.

14. In relation with this, the defendant's claim that the settlement of July 10, 2023 allows to make an "improvement allocation" as they did, is rejected. In section 3 of this settlement, it is recorded that the defendant will be entitled to submit a **"full and exhaustive response on its behalf to the plaintiffs' response to the request to annul the verdict (and not limited to a specific claim...").** This arrangement was submitted 7 days after my decision of July 3, 2023, in which I allowed the submission of a response to the answer over one page "**which refers only to the claim that the request is not legally supported by an affidavit**".

According to its language, Section 3 of the deliberative arrangement refers to this limitation, namely giving the possibility to respond to all claims in response to the answer and not only to the affidavit. It does not say that the defendant is entitled to "allocate improvements" as they did, by raising defense claims that were not included in a legally verified supporting affidavit accompanying the request to annul the verdict.

The defendant's attempt to depend on the deliberative agreement of the plaintiffs and to learn from it what it does not have is also lacking in good faith. This, mainly in view of the clear and unequivocal claims made in the answer according to which the request is not supported by an affidavit and lacks any defense claims. These claims show the intention of both parties that the meaning of the settlement is not to allow the defendant to "assign improvements" of this kind.



The District Court in Tel Aviv-Jaffa

**Civil case 57904-03-22 E.Y Orot Assets LTD and others vs. DIAMOND FOUNDRY INC**

15. In the Civil Appeals Authority 218/23 Silver v. A.Z. Management (2012) Ltd. v. Yarkoni (23.7.23), the Supreme Court determined, in the context of a request for specific disclosure, that all relevant claims must be raised in the request and not as "number of improvements", in response to the answer. This rule is true for any request including Request to cancel a judgment.

It therefore appears that the application is flawed by failing to present any defense claim to the substance of the matter, that is, to the matter of the alleged defects in the diamonds. Although claims regarding the duty of mediation, based on the agreement, were raised in it, the main point of the matter - reference to defects in diamonds - is missing.

16. As a reminder, as part of the request, the claims were made that the parties agreed in the agreement on mandatory mediation and that some of the remedies are contrary to the agreement and the limitations of liability in the agreement (with reference to several clauses in it).

As for the first claim, the plaintiffs rightly claim that in Section 4 of their attorney's letter, Appendix 4 to the lawsuit, which responds to the defendant's letter dated July 8, 2021, that is, about half a year before filing the lawsuit, they announce their agreement to resort to mediation as agreed. The defendant did not bother to reply to this letter and in any case did not respond to the offer to go to mediation, so there is no basis for their claim in this regard. Furthermore, the parties held mediation after the verdict, without success. Therefore, this claim will not be included in the defense claims, if it meets the conditions for annulment of the verdict as detailed below.

As for the second claim, it was claimed in a laconic manner and without an explanation as to which remedy is contrary to the agreement. I will mention that none of these claims are supported by the affidavit.

17. The defendant claims that leaving a judgment in the amount of 15 million NIS intact, due to a judicial defect, is a difficult and unjust result and that the defaults can be cured by costs. Alternatively, the plaintiff claims that even if the judgment is annulled, it must be conditioned on both expenses and the deposit of a significant amount.

18. Rule 131 of the Regulations authorizes the court to condition the annulment of a judgment on conditions. The litigant's conduct, all the circumstances, and the right of access to the courts must be examined (Civil Appeals Authority 8194/16 Shtenger v. Sabag (2.1.17)). Determining a deposit of the full amount of the claim is a severe sanction reserved for the most exceptional cases (Civil Appeals Authority 4838 /12 Mordov v. Tayeb (13.8.12) (However, each case on its merits and the deposit of the entire amount of the claim was approved in a particular case (Civil Appeals Authority 1119/05 Goldsil Ltd. v. Biliya Robert - 31 Properties and Building Ltd.) 27.2.05.



The District Court in Tel Aviv-Jaffa

**Civil case 57904-03-22 E.Y Orot Assets LTD and others vs. DIAMOND FOUNDRY INC**

19. Under the circumstances of the matter, there is no justification for allowing the judgment to stand, although in view of all the circumstances it is appropriate to condition the cancellation of the judgment on the deposit of a significant amount as well as the payment of expenses.

The defendant's contempt for the procedure must be taken into account, as mentioned above. One must take into account mainly the exclusion of defense claims regarding the alleged defects in the diamonds as part of the affidavit supporting the request, and not even in a legally verified affidavit as part of the response to the answer, but only two weeks later, and that too only in response to the plaintiffs' request to delete the "affidavit" attached to the response.

The defendant's claim that it is a foreign company that does not know how to conduct legal proceedings in Israel does not help it. The defendant was represented as part of the request to annul the verdict **by Israeli attorneys**, but even then, they did not submit a legal affidavit, nor did they include any defense claims in the document attached to the request, which, as mentioned, is not verified. There is no explanation or justification for this, and it is a significant deliberative omission. The "assignment of the 12 improvements" that was made afterwards is a wrongful act that must be given an appropriate meaning.

I also gave my opinion on the **matter that the defendant has 2.5 million dollars transferred to them by the plaintiffs as an advance on account of a supply fee on 10.21.20, i.e. for over three years** (Appendix 13 to the lawsuit). The defendant did not claim to be short of pocket and holding this high amount without providing the plaintiffs with almost any compensation (except for a number of shipments whose fee is reduced in relation to the amount of the advance payment), is a figure that is taken into account as an additional consideration for determining the amount of the deposit.

20. Under these circumstances, it was determined that the judgment will be annulled if the defendant places in the court treasury, in cash or with a bank guarantee, a total of three (3) million NIS, and also pays the plaintiffs the costs of the procedure in the amount of 25,000 NIS, all within 30 days from today. The cancellation, the response and the consulary verified affidavit as a defense (other than the mandatory mediation claims as stated above).

It was given in my capacity as registrar.

Given today, January 19, 2024, in the absence of the parties.



The District Court in Tel Aviv-Jaffa

**Civil case 57904-03-22 E.Y Orot Assets LTD and others vs. DIAMOND FOUNDRY INC**

יעקב שקד, שופט

Judge Yaakov Shaked

Case 3:24-cv-03385-TSH   Document 158   Filed 06/26/25   Page 65 of 72

# EXHIBIT 4

**District Court**                                               **Civil case 57904-03-22**

**Tel-Aviv**

**Regarding:**

        **1. E.Y Orot Assets Ltd., Private Company 515082220**

        **2. Omega Eco Diamonds Ltd., Private Company 516219675**

        Both by Adv. Avihai Yehosef and/or Uriah Luz

        YTL law firm

        4 Berkovitch St., Tel Aviv and/or 1 Hasorag, Jerusalem

        Tel.: 02-5335777; Fax: 02-5336664

                                      **the plaintiffs;**

                            **-VS-**

        **Diamond Foundry Inc**

        **Company ID Number 0001853958**

        By Attorneys General Yehoshua Lieberman and Asaf Bergman

        Arnon Tadmor Levy and Co., lawyers

        1 Azrieli Center, Tel Aviv 6702101

        Tel.: 03-6087901; Fax: 03-6087930

                                      **the defendant;**

# <u>Judgment</u>

1. On August 14, 2022, a judgment was issued ordering the defendant to pay the plaintiffs a total of NIS 15,000,000 plus linkage differences and interest as per law from the date the claim was filed until the actual payment; and the payment of legal expenses in the amount of 187,500 NIS plus linkage differences and interest according to law from the date of filing the claim until the actual payment; and the payment of the plaintiffs' attorneys' fees in the amount of NIS 100,000 plus linkage differences and interest as per the law from the day the claim was filed until the actual payment.

2. Execution of the judgment was suspended in view of the defendant's request to annul the judgment dated October 6, 2022, until the end of the hearing on the application to annul the judgment and a decision on it.

3. On January 19, 2024, the defendant's request to cancel the judgment of August 14, 2022 (hereinafter: **the decision of January 19, 2024** or **the decision**) was received, when in the decision of January 19, 2024 it was determined that, subject to compliance with the conditions stipulated therein, the plaintiffs would be entitled to continue and conduct the

legal proceedings.

4. The defendant filed an appeal by right against the conditions set forth in the decision dated January 19, 2024, within the framework of Appeal against Registrar's decision 35435-02-24. The appeal filed by the defendant was rejected on March 12, 2024, and the court ordered that the defendant be allowed to fulfill the conditions established in the decision of January 19, 2024, until March 31, 2024.

5. On April 1, 2024, after the deadline set for the defendant to comply with the terms of the decision of January 19, 2024, it was found that the defendant chose not to comply with the terms of the court's decision of January 19, 2024, and not to deposit the amount specified in the decision, as well as not to pay the court costs to the plaintiffs, all as stated in the decision of 19.1.2024.

**6. Therefore, the judgment of August 14, 2022 stands.**

**7. Accordingly and under these circumstances, a supplementary judgment is hereby issued ordering the defendant to pay the plaintiffs a total of NIS 18,794,006 (as of April 2, 2024), in accordance with the following breakdown:**

a) The defendant will pay the plaintiffs the amount of the claim in the amount of 15,000,000 NIS (fifteen million NIS). This amount carries linkage differences and interest according to law from the date of filing the claim (March 27, 2022) until the actual payment. As of April 2, 2024, the total interest and linkage is NIS 3,435,656.

b) The defendant will pay the plaintiffs the refund of the court fee paid in the amount of NIS 187,500. This amount carries linkage differences and interest from the date of filing the claim (March 27, 2022) until the actual payment. As of April 2, 2024, the total interest and linkage is NIS 42,946.

c) In addition, the defendant will pay the plaintiffs the attorneys' fees stipulated in the judgment of August 14, 2022, a total of NIS 100,000, the amount bearing the linkage differences and interest from the date of filing the claim (March 27, 2022) until the actual payment. As of April 2, 2024, the total interest and linkage is NIS 22,904.

d) In addition, the defendant will pay the plaintiffs the attorneys' fees stipulated in the

decision of March 12, 2024 in the amount of NIS 5,000.

| | |
|---|---|
| _____ | _____ |
| **Date** | **Judge** |

| |
|---|
| 10/04/2024          decision |
| Request 18, case 57904-03-22 |
| Rahel Arkovi |
| A signed judgement<br><br>          ** digitally signed ** |